UNITED STATES, Appellee

v.

FRANK T. ADAMIAK, Staff Sergeant, U. S. Air Force, Appellant

4 USCMA 412, 15 CMR 412

413

No. 4032

Decided June 11, 1954

Col A. W. Tolen, USAF, and 1st Lt Robert Burns, USAF, for Appellant.
Lt Col Harold Anderson, USAF, and Capt Giles J. McCarthy, USAF, for Appellee.

### Opinion of the Court

Paul W. Brosman, Judge:

The accused was convicted, following trial by general court-martial convened at Andrews Air Force Base, Maryland, under a number of charges, including nine specifications alleging the utterance of checks followed by a dishonorable failure to maintain an account sufficient to cover them—all in violation of the Uniform Code of Military Justice, Article 134, 50 USC § 728. The convening authority approved the findings and sentence, and a board of review has affirmed this action. We granted the accused's petition for review for the purpose of determining whether he was prejudiced by a recess conversation held between a prosecution witness and certain court personnel—and to decide whether prejudicial error flowed from the manner of dealing with certain challenges stemming from this same conversation.

### II

All of the checks in suit were drawn on the First National Bank of Southern Maryland—and the trial counsel initial-

ly presented evidence pertaining solely to four which had been uttered at Andrews Air Force Base. Two of these—in amounts of $50 and $34—were received from the accused by the Andrews Air Force Base Exchange on January 31, 1953. They were deposited promptly in the bank with which the Exchange did business—a branch maintained at the Base by the First National Bank of Southern Maryland. Shortly thereafter the two checks were dishonored and returned to the Exchange by the bank. Two other checks—one dated January 31, 1953, the other February 2, 1953, and each for $25—had been cashed by the accused at the Non-Commissioned Officers' Mess at Andrews. Both were deposited on February 2 in the Andrews branch of the First National. Both were returned to the Mess.

Five other checks had been issued by the accused and made payable to the Skyline Restaurant, an establishment located within the State of Maryland and about two miles from the Air Base. The first, for $17, was dated December 22, 1952; the next two, in amounts of $25 and $50, bore date of December 23, and—it appears—had been cashed by the accused to provide funds for a forthcoming Christmas furlough. A fourth check for $20 and a fifth for $25 were accepted by Skyline on January 7 and 8 respectively. All of the Skyline paper was deposited in a Washington bank and forwarded to the drawee bank for payment. The first three checks were presented and dishonored. However, following a conversation with the accused, they were redeposited by the restaurant. Again they were returned dishonored—accompanied now by the two later checks, also dishonored.

After producing testimony to the above effect, the Government called to the stand, one Pinckney, manager of the Andrews branch of the First National Bank of Southern Maryland. Through this witness there was offered to the court a copy of the accused's bank statement. This statement revealed that the latter's balance on December 22, 1952, would have sufficed to cover only the first of the three checks received from the accused by Skyline in December. On December 29, 1952, the balance was reduced to $9.26. On January 6, 1953, the account was augmented in the amount of $125, due apparently to receipt by the bank of a Government check pursuant to a Class E allotment. By charges against the account, it was reduced by January 7, 1953, to $21.36, a sum in excess of the face of the check uttered to Skyline on that date. However, two days afterward the balance was reduced to $1.16, a figure far below the face of any of the checks involved in this case. A deposit of $55.00 made January 15, 1953, was offset that same day by charges in the same amount The balance remained at $1.16, or less, until the deposit on February 4, apparently by allotment, of a further sum of $125.00.

Mr. Pinckney—testifying in part at least as an expert witness—also brought out that, in the normal course of business, all of the checks uttered by the accused at Andrews Air Force Base would have been deposited by February 3, 1953. He traced the path of the remaining paper from the bank in Washington—where it was deposited by Skyline—through the Federal Reserve System and the Federal Reserve Bank, in Baltimore, to the main office of the drawee, the First National Bank of Southern Maryland. According to Pinckney, the first three checks would, in the normal course of banking affairs, have been presented on or about December 30, 1952, while the latter two would have arrived at the drawee bank on or about January 15, 1953.

Following this testimony, and prior to further examination of Mr. Pinckney, a nine-minute recess took place during which there occurred the episode which now presents difficulty. This incident consisted of a conversation between Colonel Marstin, the president of the court-martial, Major Carter, who was a member of the body, and Mr. Pinckney. The assistant trial counsel also appears to have been one of the group—although he said little, if indeed anything. The accused was located some ten feet from the gathering during the conversation—and defense counsel was in the room during at least some portion of the exchange.

**415**

When the court-martial reconvened, defense counsel promptly challenged Colonel Marstin, who then testified concerning the subject matter of the conversation. According to this witness, general hypothetical questions were discussed—ones chiefly connected with the handling of checks transmitted by a bank located in one state for presentment at a bank situated in another. The time consumed by such handling was a subject of discussion. During the conversation Colonel Marstin expressed the general view that one who issues a check must be deemed responsible for the maintenance of funds to meet the paper on presentment. He stated under examination that nothing was said with respect to the accused, Adamiak; that only hypothetical questions concerning banking procedures were involved; that no part of the discussion was oriented to the clarification of specific matters connected with the case at bar; and that the conversation would in no wise influence his decision.

When the members of the court-martial were preparing to vote on the Marstin challenge, question was raised concerning the propriety of Major Carter's participation on the ground that he too was to be challenged by the defense in connection with the identical conversation. With a commendable attitude of fairness, Major Carter expressed his own reluctance to vote thereon—but stated that, apart from the impending challenge to his own competency, he knew of nothing which would serve to disqualify him from voting. The law officer determined that he should participate—and the challenge to Colonel Marstin was not sustained.

The members of the court-martial then proceeded to consider the challenge as to Major Carter, who under oath furnished his account of the recess conversation. He stated that the conversation was general, although it did involve a discussion of the circumstance that checks drawn on banks located in the Washington area frequently were cleared through the Baltimore Federal Reserve Bank. It was also mentioned that on occasion as much as thirty days

would transpire between the date of utterance and that of presentment of a check—and it seems to have been within this context that the Colonel remarked that a drawer should be held responsible for the maintenance of an account sufficiently large to cover his checks when finally presented. Major Carter asserted that the conversation in question had in no wise influenced his views on the case before the court, and that no part of the discussion would be considered by him in reaching a determination of innocence or guilt. The challenge to Major Carter was held not sustained by a vote of court members, and Colonel Marstin participated therein.

Mr. Pinckney was recalled after the vote on challenges, but was not questioned concerning the events which transpired during the recess. His answers then brought out that a loan had been outstanding against the accused at the First National, and that this had been the basis, in at least one instance, for the assertion of a banker's lien against his account and the application of part thereof to payment of the loan. Pinckney added that the arrival of the accused's allotment check on February 4 had anticipated by a few days the usual arrival date of such checks. No defense evidence was offered to rebut any part of the Government's case concerning the utterance of the checks.

### III

In dealing with the recess conversation, we may properly consider at the outset the import of Colonel Marstin's statement that he considered the drawer of a check responsible for maintaining at all times funds in the drawee bank sufficient in size to pay that check when presented. The context of this remark seems to have been an abstract discussion of the possibility that a check might not reach the drawee bank for several weeks, and the question of whether the drawer labored under a duty to maintain funds in the bank, however long the delay. In the case at bar the four checks uttered at Andrews Air Force Base were deposited almost immediately in the very bank on which they were

drawn. No question of delay arose. The five checks payable to the Skyline Restaurant were deposited almost as soon as. received—although some delay transpired in the course of clearance. However, this delay does not appear to have been of the magnitude contemplated in the observation made by Colonel Marstin. Accordingly, his expression of opinion bore no substantial relevance to the circumstances of dishonor of four of the checks—or probably, in fact, of any of them. Cf. 31 Am Jur, Jury, § 146.

In any event, the expression of this comparatively innocuous and general view does not at all seem to us to reveal the formation of a positive and definite opinion concerning the guilt or innocence of the accused here with respect to any offense charged. See Manual for Courts-Martial, paragraph 62$f$(10). Moreover, in light of the Colonel's entire testimony relating to the challenge to his competency, we are quite unprepared to say, as a matter of law, that any substantial doubt was raised as to his fairness and impartiality in trying the case. Paragraph 62$f$(13). Cf. 50 CJS, Juries, §§ 232 et seq. It is also to be noted that Colonel Marstin's statement during the recess conversation was made without any sort of attempt at concealment, and that it appears from the record that, when made, the remark was heard either by the accused or his counsel, and perhaps by both.

IV

The effect of the communications by Mr. Pinckney to Colonel Marstin and Major Carter gives us greater pause. The Uniform Code requires that all court-martial proceedings "shall be made a part of the record and be in the presence of the accused, the defense counsel, the trial counsel, and in general court-martial cases, the law officer." Article 39, 50 USC § 614. This provision embodies the familiar principle of the Sixth Amendment to the effect that a criminal trial shall be "public" with the tribunal "impartial," and that the accused shall in a genuine sense be guaranteed the right to confront and cross-examine witnesses and to enjoy the assistance of counsel. Innumerable ju-

dicial opinions insist that in criminal trials the accused must be present at every stage of the proceedings. 14 Am Jur, Crim Law, §§ 189 et seq; 23 ALR 2d 463; 26 ALR2d 768.

It is obvious that the right of confrontation and the right to appellate review will become valueless if witnesses may communicate with court members or jurors outside the presence of the accused and "off the record." Rules of evidence fly out the window during such private consultations. Of course, the impartiality of court members or of jurors becomes justly subject to suspicion if they are permitted to consult extensively with the witnesses of one party or the other. And—as courts have often emphasized—not only must wrong be avoided, if public confidence in the judicial process is to be maintained, but the appearance of wrong as well. Stone v. United States, 113 F2d 70 (CA 6th Cir).

Accordingly, the Supreme Court long ago proclaimed that "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear." Mattox v. United States, 146 US 140. As later cases make clear, in the Federal courts the presumption of prejudice arising from communications between jurors and a witness or other party is a rebuttable one; "but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Ultimately the trial judge determines whether the Government has rebutted the presumption of prejudice. Remmer v. United States, 347 US 227; Accord, Ryan v. United States, 191 F2d 779 (CA DC Cir); Johnson v. United States, 207 F2d 314 (CA 5th Cir); Lewis v. United States, 295 Fed 441 (CA 1st Cir); Cavness v. United States, 187 F2d 719 (CA 9th Cir); Sunderland v. United States, 19 F2d 202 (CA 8th Cir); Little v. United States, 73 F2d 861 (CA 10th Cir); United States v. Sorcey, 151 F2d 899 (CA 7th Cir);

Wheaton v. United States, 133 F2d 522 (CA 8th Cir); Higgins v. United States, 160 F2d 222 (CA DC Cir). The presumption must be rebutted by a "clear and positive showing" that the improper communication from a third person or witness did not and could not operate in any way to influence the decision. Cf. Baker v. Hudspeth, 129 F2d 779 (CA 10th Cir). And probably a rule of even greater strictness will be applied in a situation in which the unauthorized communication stems not from a witness but from one of the parties to litigation. Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co., 163 Md 401, 163 Atl 702, 86 ALR 922.

This Court—in considering cases involving the so-called "closed conference" —has been willing unhesitatingly to apply the doctrine of "general prejudice." We created, in short, an irrebuttable presumption of prejudice where we found that the law officer had consulted with court members during their deliberations. United States v. Keith, 1 USCMA 493, 4 CMR 85; United States v. McConnell, 1 USCMA 508, 4 CMR 100; United States v. Wingert, 1 USCMA 574, 4 CMR 166. It may be noted here appropriately that—as a general thing—Federal courts have been acutely concerned with events which might conceivably affect the jury during its deliberations. Mattox v. United States, supra; Fillippon v. Albion Vein Slate Co., 250 US 76; Little v. United States, supra.

We have been urged similarly to create an irrebuttable presumption of prejudice in such a case as the one at bar. Initially we may observe that such a view would be anomalous here, where the assailed conversation was in no sense secret and, in part at least, took place within the hearing of defense counsel and the accused. Moreover, the defense enjoyed full opportunity to search the entire issue in open court prior to findings, and thereby to examine and curtail the effects of any untoward remark by the bank manager. Cf. United States v. Ferry, 2 USCMA 326, 8 CMR 126; United States v. Freeman, 2 USCMA 329, 8 CMR 129. In

the "closed conference" cases, on the contrary, no opportunity was open to the defense to neutralize any misapprehension which might have been created by the law officer's remarks. Most significant, however, are the different practical backgrounds of the two situations. A "closed conference" between law officer and court members during the deliberations of the latter may easily be avoided through the simple refusal of the former to say any word to court members—however insistent their inquiries—which might conceivably be regarded as a giving of instructions or advice.

In applying the doctrine of general prejudice to such "closed conferences" we were following a permissible route to the enforcement of adherence to an attainable standard. On the other hand, in the instance of a lengthy trial characterized by essential recesses and adjournments, it is impracticable—within the framework of a necessity which is peculiarly military in nature—to prescribe that court members and witnesses be segregated during the duration of the entire hearing. The deliberations of a court-martial on findings are usually matters of hours at most. The trial itself may cover days or even weeks. Unavoidably, witnesses and court members may be thrown together in the normal course of shared military duties during recesses and adjournments. Literally, they cannot be required in all instances to remain apart—and thus to fail in the performance of essential duties—for the sole purpose of insuring that the court-martial may proceed. In particulars related to the instant problem, the conditions of military and civilian law administration differ sharply and undeniably at the trial level—and to disregard these dissimilarities is to forsake reality. The use of the notion of "general prejudice" here would entail drastic consequences, which we do not believe demanded by any sound concept of law administration or justice. Accordingly, we feel free to adopt the Federal rule that the presumption of prejudice here is rebuttable.

At this juncture two observations

seem appropriate. In the first place, the law officer may wish—and wisely—to follow the practice of numerous Federal judges, and to instruct court members that they must avoid during the trial all verbal exchanges with the law officer, counsel, the accused, witnesses, or third parties which might in any way be construed as relating to the case before them, or to related subject matter. Secondly—since in trials by courts-martial the law officer, unlike his civilian counterpart, does not rule on challenges—we deem it appropriate that an especially high standard of caution be adhered to by the court-martial in rulings on challenges affecting the competency of a court member who has conversed with a witness. As suggested earlier, in this delicate sphere "appearances" are important. Moreover, the question is not concluded by the statement of a court member that he was not influenced by a conversational contact. Without intending disrespect toward any juror, judges have emphasized repeatedly that the juror himself may experience difficulty in recognizing what has influenced him in arriving at a decision. United States v. Rakes, 74 F Supp 645 (ED Va). "Jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments cannot always be ascertained." Stone v. United States, 113 F2d 70 (CA 6th Cir). The import of an unauthorized conversation must be examined carefully, despite a court-member's assurance that it left him unaffected.

V

Against a backdrop of these observations, we must determine whether the presumption of prejudice was rebutted in the case at bar. The four checks uttered by the accused at Andrews Air Force Base fall into one category; the five cashed by Skyline into another. All of the checks in the first category were issued more than two weeks after the accused's last preceding deposit and the reduction of his balance to $1.16. They were drawn on a bank located at his home station where—foreseeably enough—they were deposited promptly, and as promptly returned unpaid. None of these checks passed through routine banking channels—for their payees took them directly to the drawee bank,[1] where they maintained their own accounts, and from which they were returned without the intervention of banks other than the drawee. So far as these checks are concerned, the only evidentiary items really contributed to the prosecution's case by Mr. Pinckney's testimony had to do with the status of the accused's account at relevant times. The testimony as to this matter involved not expertise on Pinckney's part, but the mere authentication by him of a copy of the accused's bank statement. That document—more than any words—reflected compellingly the status of the relevant account at critical times. Mr. Pinckney testified that, in the normal course of business, the Base Exchange and the Non-Commissioned Mess would have deposited their checks by February 3, 1953, at the latest—but this statement accomplished little more than a reiteration of what had been shown earlier by witnesses who had handled the deposit of the four checks involved. Moreover, this portion of the testimony was not oriented to a description of banking practice in the handling of checks, but only to a statement of the period the Base Exchange and the Non-Commissioned Officers' Mess ordinarily permitted checks to remain in their hands.

In light of Mr. Pinckney's limited role in the presentation of the Government's case as to these four checks, and the uncontradicted testimony of other Government witnesses, it is difficult to see how his statements during the recess could possibly have influenced the

---

[1] It is unnecessary to examine the law of negotiable instruments to determine the exact time of presentment, and whether the deposit of the checks constituted presentment for present purposes. Probably the bank, as depositary, was the agent of the depositor for presenting the check on itself as drawee. In any event, the presentment was roughly contemporaneous with the deposit of the checks.

419

findings under the specifications concerned with those checks. Banking procedure in clearing checks between different banks in different states—the chief subject of the recess conversation—simply had no applicability. The four checks now under consideration were handled by a single bank, and they seem never to have departed the limits of the Air Base. Any abstract question as to how long a check might be delayed in presentment, or might be held by the payee, was wholly unrelated to the background of the checks which had been deposited in the First National Bank of Southern Maryland—the drawee—only a short time after their receipt by the payees. While recognizing that conversations between a witness and court members may give the witness an opportunity improperly to enhance the tribunal's esteem of his expertise—and Mr. Pinckney's expert qualifications were indeed assailed by the defense—we deem that single circumstance insignificant as to the four checks uttered at Andrews. No expert testimony was given by Pinckney which, in any real sense, was material to the findings having to do with them. In short—and after careful scrutiny of the record—we are convinced that a "clear and positive showing" was made rebutting any presumption that the accused was prejudiced by the recess conversation insofar as the first, or Air Base, category of checks is concerned.

However, the second category is so distinct as to require a contrary result, and to demand a holding that the evidence was insufficient to rebut the presumption of prejudice. Two of the five checks issued to the Skyline Restaurant were uttered at a time when the accused's bank account was large enough to cover them. The court had before it evidence sufficient to enable its members to conclude that, by the time those checks cleared through the Federal Reserve System in the regular course of banking business, the accused's account was depleted to the point where it would not permit their payment. The most significant portion of this evidence was Mr. Pinckney's expert testimony as to the route the checks had followed, and the time required for pre-

sentment through the Federal Reserve Bank of Baltimore. The recess conversation also dealt with the movement of checks in clearance—and indeed in clearance through the selfsame Federal Reserve Bank of Baltimore. The recess discussion concerned interstate clearances—and all the checks issued to Skyline were cleared as interstate items between a Washington bank and one located in Maryland. The time which might intervene between utterance and presentment was particularly adverted to in the course of the conversation. Because of the substantial overlap between the subject matter of Mr. Pinckney's expert testimony and the subject matter of the recess conversation, we are unwilling to say that sufficient evidence was produced to rebut the presumption that prejudice from the conversation resulted to the accused with respect to the two checks, which *could have been* covered by accused's account had they been presented shortly after they were drawn.

The remaining three checks cashed by Skyline were uttered at times when the accused's account was insufficient to permit payment. However, deposits were made subsequently which would have been sufficient to cover each of them—had they been presented within the interval before the increase in the account due to the deposits was offset by certain charges whose nature was never explained. The court had before it evidence that the checks were returned unpaid. And it could conclude permissibly that the reason for this dishonor was to be found in their presentment at a time when the accused lacked sufficient funds in his First National account. However, that conclusion was integrated with Mr. Pinckney's testimony concerning the route followed by the checks in reaching the drawee bank and the time occupied thereby. Since this area of testimony was the subject of the recess conversation, we believe the presumption of prejudice as to the findings of guilt connected with these three checks was also left unrebutted. Accordingly, insofar as all five of the specifications dealing with Skyline Restaurant checks are concerned, the failure to sustain the challenges in-

terposed by the accused constituted prejudicial error.

## VI

The argument has been advanced that, if the recess conversation here was prejudicial as to any of the charges and specifications then, automatically, it must be deemed prejudicial as to all —this apparently on the theory that we have before us an instance of "jury tampering," an attempt improperly to influence the triers of fact. If, in truth, the record revealed an instance of "jury tampering," we would doubtless be faced with so serious a transgression as to demand reversal of all findings—and in such an instance we would presumably choose not to cause our result to hinge on the discovery of specific prejudice to the accused as to any particular charge under which he was convicted.

The case at hand, however, reveals no sort of effort to "tamper" with or to "influence" any member of the court-martial—and it is perfectly clear that the challenged communication from Mr. Pinckney was oriented toward the imparting of casual and general information, rather than the altering of attitudes. Our basis for this knowledge is found in the consistent and undisputed evidence of both Colonel Marstin and Major Carter, the only witnesses who testified to the content of the interchange in question. Analytically the situation before us rather resembles the mere receipt of inadmissible evidence inadvertently or innocently offered. While the "evidence" from Mr. Pinckney, as previously demonstrated, might have affected the findings under some of the worthless check specifications, it was in no wise matter of an inflammatory nature, which would permeate them all.

We have indicated that we do not consider a "general prejudice" approach to be either required or appropriate within the present context. Cf. United States v. Lee, 1 USCMA 212, 2 CMR 118. Nor do we see fit to utilize the melange of suggested approaches under which, if an accused is "specifically" prejudiced as to any finding, he must be deemed "generally" prejudiced as to all. Such a medley does not harmonize with acceptance of the Federal rule that the presumption of prejudice from a recess conversation, like that here involved, can be rebutted. Instead, rebuttal of prejudice would be precluded once a single finding is determined to have been tainted—no matter how unrelated that finding may be to others.

Admittedly in the "closed conference" decisions—and in United States v. Marsh, 3 USCMA 48, 11 CMR 48—we reversed all findings of guilt, although some were more closely connected to the error assailed than others. However, such cases involved transgressions wholly different from that found here—ones at once more serious and more nearly subject to control through adherence to a hard-and-fast rule of reversal. Moreover, those transgressions were sufficiently gross as to require reversal without any attempt to discern specific prejudice as to any single finding of guilt. Thus, while those precedents might bear on rejection of the Federal rule that the presumption of prejudice may be the subject of rebuttal, they do not at all suggest that the rebuttal itself must be on an "all-or-nothing" basis.

Under our analysis, the instant case demonstrates the difficulty of the suggested approaches. The recess conversation was not so flagrant an error as to demand a rehearing without examination of its possible effect—or want of it—on the findings. We have demonstrated—we believe—that the impact of the information communicated by Mr. Pinckney did not even affect all of the findings of guilt of worthless check utterance. A fortiori, it is impossible to descry how this information could possibly have affected the court's findings that the accused was guilty of: (1) soliciting a bribe, in violation of Article 134 of the Code; (2) dereliction of duty, in violation of Article 92; and (3) absence without leave, in violation of Article 86. By no stretch of the imagination may it be said that the talk had anything to do with the subject matter of any of those findings.

If the Federal rule is to be accepted

**421**

here, the only route leading to the proposed reversal of *every* finding of guilt is indulgence of the assumption that—if an accused is prejudiced as to one of several findings of guilty—inevitably he is prejudiced as to all. Such an assumption was not made under the Articles of War, and has consistently been rejected by all appellate agencies under the Uniform Code. While circumstances are conceivable which might demand reversal of several findings because of error affecting only one, we see nothing in the present case which reveals the presence of any of them.

### VII

An additional question has been posed as to the propriety of the procedure at the trial under which ■ Major Carter was permitted to vote on the challenge to Colonel Marstin—although it had been indicated to all concerned that the former was himself to be challenged by the defense on the same ground. Insofar as the challenge to Colonel Marstin was based on his own expression of views concerning the responsibility of the drawer of a check, we conclude that Major Carter was in no way tainted by that statement. The real question there was whether Colonel Marstin entertained an opinion which disqualified him to sit during the hearing. There was no indication that the Major would have been influenced in his determination of guilt or innocence by the remarks of Colonel Marstin, or that he labored under the impression that the rules determining criminal responsibility were to be furnished by the latter, rather than by the law officer of the court-martial. In ruling on the challenge to the Colonel, all of the members of the court were compelled to hear the questioned statement repeated—and we are sure that Major Carter is not to be differentiated in any manner from other members for the reason that he had heard this statement twice, rather than one time, and had heard it earlier than his fellows. There seems to have been no dispute relative to the general content of the statement made by Colonel Marstin.

Since Major Carter had participated in the conversation with Pinckney to the same extent as Colonel Marstin had done, some hesitation is encountered in approving a procedure whereby he was permitted to vote on the challenge of the Colonel. Yet we can perceive no alternative to such a holding. The Uniform Code, supra, in Articles 41, 51 and 52, 50 USC §§ 616, 626, 627, clearly directs that the members of the court-martial shall, by their vote, determine the validity of a challenge. Were challenges to a panel allowed—and they are not—it would be possible for an astute defense counsel to postpone trial indefinitely. A challenge to the panel would disqualify the very group of persons selected to determine the validity of challenges—to wit, the members of the court—for one is not permitted to vote on a challenge against himself. However, the defense position here would seem to present similar difficulties—for if member A is disqualified to pass on a challenge as to member B because both are challenged on the same ground, it would seem that, through challenges to all the members of the court on the same ground, an accused could produce a situation in which no one eligible to pass on the validity of the challenge would remain. Thus a complete impasse would result.

Perhaps with this in mind, the Code in Article 41 specifically provides that the court-martial "shall not receive a challenge to more than one person at a time." Article of War 18 contained a similar directive; and the rule seems well embedded in military law that an accused may only challenge court members singly—although he may deem them all subject to challenge, and as well perhaps to challenge on the selfsame ground. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 207. The Manual for Courts-Martial United States, 1951, in paragraph 62*a* sets forth the same rule—and service practice seems uniform in demanding that one member's challenge be considered at one time, and that all members vote thereon, save him whose competency is to be determined. United States v. Sheets, 81 BR 305; United States v. Johns, 66 BR 169; United States v. Martinez, 75 BR 75; United States v. Koon [ACM 118], 1 CMR (AF)

676; United States v. Baker [ACM 5878], 7 CMR 736; United States v. Stuart [CGCMS 19348], 4 CMR 476. It has been suggested that the law officer—like the civilian judge—should pass on challenges, and that Congress should promulgate a new and more desirable rule in such a situation. There is much to be said for this proposal, and we incline distinctly to favor it. However, we are without power to create such a procedure ourselves. Accordingly, we must conclude that no error was committed by reason of the practice followed in this case.

### VIII

In accord with the foregoing, the five findings related to checks issued by the accused to the Skyline Restaurant must be reversed. The record of trial is remanded for possible reassessment of sentence.

LATIMER, Judge (concurring in the result):

I concur in the result.

I do not question the principles of law announced by Judge Brosman, but when I apply them to the facts of this case, I reach a contrary determination on one aspect of the case. The principal area of disagreement is on the application of the rule that the burden rests heavily on the Government to establish, after notice to and hearing of the accused, that communications between a court-martial member and a witness were harmless to him. I can dispense with any discourse on hearing and notice as accused and his counsel were within a few feet of the conversationalists and were well aware that discussions were being carried on. The claimed irregularity was called to the attention of the court-martial by counsel for the accused immediately after the recess and he was not restricted in any manner from developing the subject on voir dire of the two court members.

There are some slight variations in the facts I find in the record and those related by Judge Brosman, but they have little impact on the result. For the sake of accuracy and clarity, I will set up the five transactions in a chart, and the dates of the checks, times of presentments, balances on hand, and other relevant data can be determined in short order. First, however, I point out that Mr. Pinckney, in answer to a question while he was on the witness stand, followed the course of the check from utterance to final clearance through the depository bank. He stated that a check deposited by a payee in a bank in Washington, District of Columbia, would clear through the Federal Reserve Bank in Baltimore, Maryland, and then to the main office of his bank in Upper Marlboro, Maryland. However, that information was not peculiarly within his knowledge and it was not the subject of expert testimony as members of the court-martial could readily ascertain the facts from the back of four of the five checks given to the Skyline Restaurant. The reason it could not be obtained from the fifth check is the record contains only a photostatic copy of the face of that instrument. The witness further testified as to the clearance time of each of the five checks, and in no instance was it greater than eight days. Some reached the bank in seven days time from the date of utterance, while others took one day longer. Again that information could with some degree of accuracy be gained from the exhibits.

The information I consider helpful to show the status of accused's account is shown on the following chart:

| Exhibit No. | Date of Issue | Amount of Check | Balance on Hand at Time of Issue | Received at Bank | | Balance on Hand at Time of Receipt |
|---|---|---|---|---|---|---|
| 27 | 12/22/52 | $17.00 | $24.36 | 12/30/52 | | $6.36 |
| | | | | 1/15/53 | (2d time) | $1.16 |
| 28 | 12/23/52 | $25.00 | $19.36 | 12/30/52 | | $6.36 |
| | | | | 1/15/53 | (2d time) | $1.16 |
| 29 | 12/23/52 | $50.00 | $19.36 | 12/30/52 | | $6.36 |
| | | | | 1/15/53 | (2d time) | $1.16 |
| 30 | 1/7/53 | $20.00 | $21.36 | 1/15/53 | | $1.16 |
| 31 | 1/8/53 | $25.00 | $21.16 | 1/15/53 | | $1.16 |

**423**

An inspection of this chart will show that the check referred to in Exhibit 27 was written when there were sufficient funds in the bank to pay the check. However, other checks which were negotiated by the accused arrived at the bank prior to December 30, 1952, and when they were debited against his account, the balance remaining was insufficient to cover the check arriving on that date. The first three checks in the sum of $92.00 were issued on December 22–23, 1952, and it matters little whether we take the balance on the day of utterance or on the date the checks arrived at the bank as the balance varied from $24.36 to $6.36 and had the first one been cleared the other two could not have been paid from the funds remaining. Those three checks were returned by the drawee at the request of the accused on or about the same date as the last two, and when the five arrived there was $1.16 on deposit. The check issued on January 7, 1953, was less than the amount on deposit on that date, but again other checks which arrived at the bank at an earlier date depleted the sum and the first three checks were still outstanding and unpaid. As a matter of record during the period covered by the chart, there was one deposit in the sum of $125.00, but the total sum of the checks written amounted to $265.00. That accused was well aware of the fact that the checks could not be paid by the bank either at the time of issuance or presentment finds ample support in the record.

In order to determine any possibility of prejudice from the recess discussions, it is necessary to weigh the sum total of the evidence on the five transactions against the subject matter of the communications and determine whether there is any probability that the latter had any effect on the deliberations and findings. In so far as I have been able to ascertain, there is no evidence in the record which in any way disputes or casts doubt on the testimony of Mr. Pinckney and that furnished by the exhibits either as to the time or course of clearance. No testimony on these particular offenses was offered for or on behalf of the accused and the only possible defense I can glean from the proceeding could only arise out of a claimed weakness in the Government's case or in a theory suggested by defense counsel in his argument, i.e., that these checks were given for gambling debts. It is in that posture of the record that I assess the conversations for prejudice.

The crime charged in this case is that the accused wrongfully and dishonorably failed to maintain sufficient funds in his checking account to pay the checks upon their presentation. The record shows no contrary agreement with the drawee or the bank so the checks were payable immediately without any days of grace or travel time. They could have been handcarried to the bank and presented to it on the day of execution as the accused represented there were funds on deposit to pay the full amount of the check. Unless he was prepared to establish a course of conduct different from standard banking practices, the course the checks travelled and the time of clearance have nothing to do with his obligation to maintain a balance to pay them when presented.

I have gone over the record with a fine-tooth comb and I have been unable to find a scintilla of evidence to the effect that the conversation concerned any matter involved directly or indirectly in this litigation. Stated in a manner most favorable to the accused I gather the following facts from the testimony of the participants: The conversation occurred during an announced five minutes recess taken at the request of counsel for the accused. There were three active participants in the discussion and the communications were carried on in the courtroom in full view of the accused, his counsel, and anyone else therein present. Only two of the parties were called to testify on the substance of the communications and several essential facts were established with certainty. These were that the subjects discussed involved hypothetical questions; there was no conversation concerning the case at bar; the two members of the court-martial were not influenced for or against the accused by the communications; and they could

fairly and impartially return a finding, uninfluenced by any evidence not produced in open court.

That there could be no possible prejudice to the accused can be ascertained readily by evaluating the subject matter of the communications. Specifically, Colonel Marstin testified that they were discussing hypothetical questions about checks, banking accounts, firms in other states, checks being written, how long they could be held and the course of travel from the drawer to the depository bank. One statement made by him was that he believed a man is responsible to have money in the bank to meet a check when it is uttered. This statement was tied in with the further comment that a man who signs his income tax form is chargeable with the information contained therein. Judge Brosman concludes those statements were not prejudicial and with that holding I agree.

The subject which most nearly touches on the facts of this case can be found in three answers given by Major Carter. They were as follows:

"Colonel Marstin made the remark to Mr. Pinckney that he was surprised to learn a check which he gave to an organization, a business establishment downtown, departed another bank, not his own, and had to go through a Federal Reserve Clearing House in Baltimore prior to being presented to his bank for payment. The conversation then went to a general discussion as to the possible number of people that handled a check, and the possible length of time it could be delayed from the time of making until it reached the bank on which it was drawn. [Record, page 315.]

• • • • •

"Colonel Marstin said that it would be possible for me to give my check to someone in another state, for whatever reason, and for that person to give it to his plumber, and for him to give it to his grocer, and hence through a number of other hands without going through normal bank-

ing channels for some longer period of time. I believe Mr. Pinckney stated on occasion it took longer than thirty days for a check under those circumstances to reach the bank.

• • • • •

"I believe the statement [by Colonel Marstin] was that a man was responsible to have sufficient funds in his bank to cover a check drawn in the same way that he is responsible on his income tax return to sign it. It was part of the same statement. There was no interval in between the two." [Record, page 316.]

Conceding that Colonel Marstin was surprised to learn that a check deposited in a downtown, Washington, District of Columbia, bank was cleared through the Baltimore branch of the Federal Reserve Bank, I am unable to ascertain how, or in what way, that would affect his conclusions in this case. It is almost common knowledge that a check presented to one bank clears through a branch of the Federal Reserve Bank before it reaches the paying bank and that fact, if of any materiality, was established without dispute by testimony in the record. His surprise may have been occasioned by the information that there was no Federal Reserve branch office in Washington, D. C. But an announcement of surprise at testimony given in court is not receiving evidence out of court. Again conceding, as stated by Major Carter, that a hypothetical situation based on the passing of a check from a plumber to a grocer and then through other hands was considered and it was stated that thirty days time might elapse before it reached the depository bank, wherein does that prejudice the accused? While the precise time in an assumed case might not be known, I can hardly charge anyone with not knowing that the more hands through which a check passes the greater the length of time it takes to reach its ultimate destination. In the hypothetical case it might require thirty days to clear a check, but I am unable to ascertain how that time element could affect the guilt or innocence of this accused. The evidence on

**425**

his transactions disclosed that the checks went from the payee restaurant to a District of Columbia bank, through the Federal Reserve, and then to the depository bank, and the times involved never exceeded eight days. Most assuredly, time based on supposititious cases would vary according to the facts assumed, but the court-martial was not trying a fictitious case, the times in this case were fixed and, regardless of the time of presentation to the paying bank, the funds on hand were insufficient. Finally, the statement that a man is responsible to have funds in his bank to cover a check drawn by him, and its legal comparison with an income tax return, is nothing but a statement of the legal obligations imposed on those who execute checks and sign income tax returns. It is axiomatic that the drawer of a check under the circumstances of this case represents that there are funds on deposit for the purpose of paying the check at any time it is presented.

Judge Brosman anchors his finding of prejudice on the possible overlapping of testimony given on the trial and information conveyed in the communications. Principally he relies on subjects touching on the course of the particular checks and the time interval for them to clear in the immediate area. Even if the same facts related on the witness stand were restated in the communications, I would encounter some difficulty in finding prejudice; but the best answer to his assertion is there was no discussion common to both. In support of that statement I quote the following questions and answers:

"Q. There was nothing said with specific reference to this particular accused or this particular case?

A. [By Colonel Marstin] It was not. [Record, page 311.]

. . . . .

"Q. Colonel Marstin, was there anything in your conversation with the witness, Mr. Pinckney, in order to clarify anything in your mind in connection with this case?

A. There was not. [Record, page 312.]

. . . . .

"Q. And this discussion as to the mechanics of handling was in reference to the local situation, local banks and in the local area. Is that correct?

A. [By Major Carter] That is not correct. This was a general discussion and primary hypothetical cases were discussed of cashing a check in another state and the possible number of people through whom it would pass in reaching a current bank locally. [Record, pages 315 and 316.]

. . . . .

"Q. Was anything discussed in reference to the testimony previously given by a witness?

A. No, except, as I stated, that Colonel Marstin was surprised to learn that a check from a local bank had to go to Baltimore.

"Q. Were there any questions to clarify or explain the testimony of the previous witness?

A. No.

"Q. Was the individual case itself now on trial discussed with the witness?

A. It was not." [Record, page 317.]

What was said about jurors by the Circuit Court of Appeals, Seventh Circuit, in United States v. Sorcey, 151 F2d 899 (CA 7th Cir), is equally applicable to members of a court-martial. That court stated the following principle, and I would apply it to this case:

"To be sure, the jury should pass upon each case free from external causes tending to disturb the exercise of deliberate and unbiased judgment, hence, communications, between jurors and third persons or officers in charge of the jury, are absolutely forbidden, and, if it appears that such communications have taken place, a presumption arises that they were prejudicial, but this presumption may be rebutted by evidence, Wheaton v. United States, 8 Cir, 133 F2d 522. But, we must not permit the integ-

rity of the jury to be assailed by mere suspicion and surmise; it is presumed that the jury will be true to their oath and conscientiously observe the instructions of the court, Baker v. Hudspeth, 10 Cir, 129 F2d 779, 782."

While I concur with Judge Brosman that for many reasons witnesses and jurors should not converse, they need not act dumb and mute in the presence of each other. If every conversation is outlawed, then a friendly good morning advanced by one to the other is per se prejudicial and the cause must be retried. In so far as the instant case is concerned, the topics of conversation were no more prejudicial than would be a discussion of the weather, the policy of the Army, or a thousand other subjects which could be mentioned. Of course, passions can be swayed by an exhortation on the right of a fair trial but unless the record establishes a violation of that right, an accused is not entitled to a reversal. Certainly, the better reasoned cases support the rule that a presumption of prejudice can be rebutted, and I have no hesitancy in saying they would not do so if communications could not be tested for the possibility of prejudice. Judge Brosman adopts the rule and applies it more generously than do I, but to reverse a finding of guilty for soliciting a bribe or for being absent without leave because a member of the court-martial asked the witness about a negotiable instrument, does not weigh for prejudice —it throws away the scales.

I would affirm the decision of the board of review but for me to refuse to yield ground would result in a stalemate. Judge Brosman's result is more in keeping with my concepts than those of the Chief Judge and I, therefore, join him in disposing of this litigation. Accordingly, I concur in his result.

QUINN, Chief Judge (dissenting):

I dissent.

Judge Brosman concedes that the presumption of prejudice was not overcome with respect to some of the specifica-tions. He seeks to confine the effect of the error to those offenses. However, I do not agree with this effort to compartmentalize the taint of improper influence upon the triers of fact.

An accused is entitled to a fair trial. That includes the right to trial by a jury which has not been affected in any improper way. Whenever such influence appears, we cannot limit its pernicious effect to one or another of the charges.

Prejudice of this kind strikes at the heart of a fair trial. Certainly, we have attempted no such refinements in assessing the effect of a closed session conference between the law officer and the court. In United States v. Smith, 1 USCMA 531, 4 CMR 123, the accused was tried for murder and rape. He was convicted only of rape. The record indicated, in closed session, an improper discussion between the law officer and the court, regarding the admissibility of a dying declaration. The discussion related to the murder charge only, of which the accused was acquitted. And yet, this Court reversed the conviction. We said:

". . . A conference of the type held here is clearly condemned by the law and the policy demanding enforcement of that law is so important as to warrant reversal regardless of the possible effect or non-effect of the law officer's remarks upon the deliberations of the court."

It is significant that no attempt has ever been made to limit the effect of improper influence whenever the convening authority has acted as an accuser. In United States v. Marsh, 3 USCMA 48, 11 CMR 48, the accused was convicted of two offenses, unauthorized absence and willful disobedience of a lawful order. We held that the convening authority was an accuser with respect to the order upon which the disobedience charge was based. We then specifically passed on the question whether the unauthorized absence charge could be sustained. We determined that the error saturated the entire case. Inherent in that de-

cision, and in cases such as United States v. Gordon, 1 USCMA 255, 2 CMR 161, is the paramount consideration for an absolutely fair trial. In my opinion, the decision in this case departs materially from that sound policy. I would reverse the finding of guilty and order a new trial.