UNITED STATES

v.

**Ambrose Lawrence McKINLEY, 293 72 0376, Hospitalman Apprentice (E–2), U.S. Naval Reserve.**

NMCM 82 0204.

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 10 July 1981.

Decided 20 Dec. 1982.

LCDR William A. DeCicco, JAGC, USN, Appellate Defense Counsel.

MAJ Charles Wm. Dorman, USMC, Appellate Government Counsel.

Before GLADIS, Senior Judge, and GARVIN and MALONE, JJ.

MALONE, Judge:

Contrary to his pleas, appellant was found guilty by members at general court-martial of one specification of Article 123a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 923a, the unlawful uttering of checks with intent to defraud, and one specification of Article 134, UCMJ, 10 U.S.C. § 934, the unlawful obtainment of long distance telephone services under false pretenses.[1] Appellant was sentenced to confinement at hard labor for five years, total forfeitures, reduction to pay grade E–1, and a dishonorable discharge. That discharge has since been commuted by the Naval Clemency and Parole Board to a bad-conduct discharge. Appellant assigns four issues for our consideration:

I

APPELLANT HAS BEEN DENIED A FAIR TRIAL AND DUE PROCESS WHERE THE MILITARY JUDGE DENIED A DEFENSE REQUEST TO INQUIRE INTO THE CIRCUMSTANCES BEHIND THE SENIOR MEMBER'S PASSING A NOTE TO ANOTHER MEMBER AND LAUGHING ABOUT IT AS THEY LEFT THE COURTROOM PRIOR TO AN ARTICLE 39(a), 10 U.S.C. § 839(a) SESSION.

II

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ADMITTING INTO EVIDENCE PROSECUTION EXHIBITS 28, 29, 37, 41 AND 42 OVER DEFENSE OBJECTION (R. 97). THE ENTRIES ON THESE DOCUMENTS ARE HEARSAY WHICH ARE NOT SUBJECT TO ANY EXCEPTIONS TO THE HEARSAY RULE. MILITARY RULE OF EVIDENCE 801.

III

THE STAFF JUDGE ADVOCATE'S REVIEW IS DEFICIENT.

IV

APPELLANT WAS DENIED PRETRIAL EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS DETAILED COUNSEL WAIVED APPELLANT'S RIGHT TO AN AVAILABLE INDIVIDUAL MILITARY COUNSEL WITHOUT APPELLANT'S KNOWLEDGE OR CONSENT.

I

The facts giving rise to this assignment involved the observations of the detailed defense counsel of the activities of two of the members immediately after they had withdrawn from the courtroom for a recess. The military judge had just convened an Article 39(a) session.[2] The detailed defense counsel, absent from the courtroom on other business with the express approval of the accused, was returning to the court when he observed the senior member pass something to another member, after which there was an exchange of some laughter between them. Although he disclaimed to know exactly what was passed, he reasoned it to be a note written by the senior member while the court was in session. He then requested the military judge to determine the nature of the reputed note and whether the apparent good humor of these members in-

---

1. The evidence adduced at trial showed appellant uttered 38 checks between 24 October 1980 and 3 February 1981, totaling in excess of $2,200.00. During the period 29 May 1980 and 20 November 1980, the evidence showed appellant conducted at least 51 unauthorized long distance satellite telephone communications between Guam and Toledo, Ohio, services which were valued in excess of $2,500.00.

2. Article 39(a), Uniform Code of Military Justice (UCMJ).

dicated their "possibly . . . taking the matters transpiring in jest." The military judge denied the request, finding nothing unusual in the mutual communication of members during recess.

 Whenever a judge has denied an accused relief in a situation regarding a suspect communication between two panel members, the threshold for finding abuse of discretion is higher than that to be crossed where the questionable discussion occurred between a member of the panel and an external source, be that individual a counsel, judge, witness, or otherwise. *Compare Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) and *United States v. Adamiak,* 4 U.S.C.M.A. 412, 15 C.M.R. 412 (1954) and the cases cited therein. Here, appellant is entitled to no relief under these circumstances. There has been no showing of a clear abuse of judicial discretion. *United States v. McQueen,* 7 M.J. 281 (C.M.A.1979). *See also United States v. Silverthorne,* 430 F.2d 675, 678 (9th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971).

The actions of the two members gave no cause to believe them inattentive to the matters at trial. *Compare United States v. Brown,* 3 M.J. 368 (C.M.A.1977) and *United States v. Groce,* 3 M.J. 369 (C.M.A.1977). To the contrary, from the numerous cogent and incisive questions posed by the members, the record is replete with evidence of the close attention paid to this trial by each of them. The military judge was far better disposed than the detailed defense counsel to judge the actions of the members during the period of that counsel's absence from the court.

The members' conduct does not breach any applicable standard of propriety. Indeed, the suggestion of impropriety is speculative, at most. *See United States v. Perry,* 550 F.2d 524 (9th Cir.1977), *cert. denied,*

434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977), *reh'g denied,* 434 U.S. 976, 98 S.Ct. 536, 54 L.Ed.2d 469 (1977).

## II

Evidence was received and published to the members in the nature of business records that 113 long distance satellite telephone calls had been made to 13 different telephone numbers within the Toledo, Ohio area code (419) from Guam. These 113 calls were billed to the accounts of six different telephone service subscribers. All of these subscribers testified that they had no knowledge of those calls billed to their individual accounts and by or to whom they were made. They had not authorized the use of their account numbers to make these calls.

 Prosecution Exhibits 27, 28, 29, 37, 41, and 42 were verification slips utilized in the course of business by RCA Global Communications, Inc., the contracting satellite communication system, and the U.S. Navy Public Works Center, Guam.[3] These slips were used by RCA employees to record the results of verification inquiries made for long distance telephone calls disputed by the subscriber to have been made. The inquiry consisted of calling the disputed number, asking the identity of the party receiving the verification call, and inquiring whether anyone at that number had had occasion to receive a call from Guam, and, if so, who that calling party was. No testimonial evidence was offered as to the results of the inquiries as recorded in the contested documents.

In their pristine form, the exhibits in question identified 15 individuals who had received telephone calls at nine disputed telephone numbers. The slips recorded each of the parties who identified the accused as the calling party. Citing Military

---

3. For some unexplained reason, appellant's assignment of error goes only to Prosecution Exhibits 28, 29, 37, 41, and 42. It did not include Prosecution Exhibit 27, although trial defense counsel had objected to its admission at trial, as well. It is a mere duplication, however, of the evidence admitted in Prosecution Exhibit

28. Thus, our resolution of that document's admissibility is applicable to Prosecution Exhibit 27 without our having to decide whether appellate defense counsel has waived objection to Prosecution Exhibit 27 by failing to include it in his assignment of error.

Rule of Evidence (MRE) 805, the defense objected, reasoning that the responses of the parties called by the RCA employees and recorded on the verification slips were hearsay within hearsay and, therefore, inherently unreliable. The military judge admitted the contested documents as business entries admissible within MRE 803(6), but only after ordering the masking of all information contained therein which identified the accused as the calling party. Thus, only the identity of the responding party was published to the members.

The Government apparently believed it was left by this ruling in the position of having to provide a direct evidentiary link between the accused and the parties receiving the disputed calls. In a surfeit of caution, trial counsel published only Prosecution Exhibits 27 and 28 to the members. Each identified a Mrs. Schoettle[4] as the receiving party at one of the disputed numbers. Accordingly, appellant's objection to Prosecution Exhibits 29, 37, 41 and 42 was mooted and his assignment of error relative to them is without merit.

We need only decide whether the statement of the party identifying herself as Mrs. Schoettle is admissible within the context of MRE 805. We find that it is, having been properly admitted as a record of the regularly conducted business activity of an RCA employee. MRE 803(6).[5]

This evidence, however, is of little consequence in the face of other *compelling* evidence of appellant's guilt of Charge II and its specification. We are convinced that even without Prosecution Exhibits 27, 28, 29, 37, 41, and 42, appellant's guilt was proven beyond a reasonable doubt. This additional evidence consisted of a Request for Leave chit, a Special Liberty chit, and a Space "A" Travel Authorization form, Prosecution Exhibits 8, 9, and 10, each taken from appellant's service records and containing his signature. They identified his home and leave address as that in Prosecution Exhibit 84. *See* footnote 4. They also contain two telephone numbers which are identical to two numbers comprising 51 of the disputed 113 unauthorized telephone calls.

## III

Appellant contends that diverse topics contained in the staff judge advocate's review were either the subject of deficient review or were improperly included in the review. We disagree, finding the review of these topics either to be adequate, proper, or, where initially inadequate, remedied upon defense counsel's response to the review. Despite a 17-page review, nearly exhaustive in its inclusion of every necessary issue and subject, we are inclined to agree that the initial review, standing by itself, was deficient in its failure to provide the convening authority those "lucid guideposts" necessary to his decision-making process. It failed to apprise the convening authority of and to discuss: (1) the elements of the two offenses; (2) the affirmative defense of honest mistake raised by appellant as to Charge I; and (3) the maximum sentence imposable by the Court. *United States v. Hagen,* 9 M.J. 659 (N.C.M.R.1980); *United States v. Powis,* 8 M.J. 809 (N.C.M.R.1980); *United States v. Crittenden,* 2 M.J. 941 (A.C.M.R.1976). *See also United States v. Williams,* 7 M.J. 725 (A.C.M.R.1979).

By his initial and amended responses to the review, however, the trial defense counsel alerted the convening authority to the claimed deficiencies, thereby bringing to his attention the conflicts and issues deemed to have been totally omitted or inadequately discussed. These defects in the review therefore were cured, resulting in no prejudice to appellant. *United States v. Briggs,* No. 81 3500 (N.M.C.M.R. 18 May 1982).

---

4. Prosecution Exhibit 84, appellant's application for enlistment, identified his current address in Toledo, Ohio, as the home of his mother, June Violet Schoettle.

5. There is confusion and ambiguity evident in the record as to whether defense objection to these contested documents was withdrawn in whole or in part. Accordingly, we choose not to dispose of this issue under the doctrine of waiver. MRE 103(a)(1).

The soundness of this conclusion is evident inasmuch as the convening authority, when taking his action, cited specifically those pages of the staff judge advocate's Article 34, 10 U.S.C. § 834 advice [6] and the record of trial where the elements of the offenses, the affirmative defense, and the maximum sentence were delineated and discussed. It is readily evident that the convening authority has read the record of trial as there is direct evidence of that fact.

## IV

On 13 April 1981 Lieutenant (Lt) C was detailed by the convening authority as defense counsel for appellant. Their attorney-client relationship extended, at least, back to December 1980, when Lt C had first been detailed to represent Hospitalman Apprentice McKinley at his Article 32 [7] pretrial investigation. This investigation ultimately led to appellant's general court-martial conviction now before this Court. It is conceded, therefore, that the attorney-client relationship existing between Lt C and appellant was well-founded prior to the order convening appellant's general court-martial.

It was already then known by both the convening authority and Lt C that the latter's transfer to the Naval Communication Station, Harold E. Holt, located in Australia's Northwest Cape, was scheduled during the following month. Accordingly, a trial date was set for 5 May 1981 which preceded counsel's projected detachment. Several diverse events resulted in the slippage of that date.

Thereafter, appellant requested representation by individual military counsel (IMC), presenting to the convening authority the names of 22 judge advocates. One was Lieutenant Commander (LCdr) Friedman. Each was requested in the alternative in the order of their presentation until one either was found to be available or the list exhausted. The date of trial was rescheduled for 1 June 1981. Yet, within the week of his submission of this shopping list for individual military counsel, and before all responses to the individual message requests had been received, Lt C approached his commanding officer, requesting his detachment and transfer that very same day.

He cited several pressing personal and financial reasons why he believed it necessary he be allowed to transfer immediately. These included: (1) his family had moved out of quarters and were lodged in a local motel; (2) his entitlement to a Temporary Living Allowance fund in payment of the motel lodging had been exhausted; (3) he had previously arranged air transportation for his family and himself from Guam to the mainland; and, (4) he had an involved schedule of social and family events in California during his leave period in transit from Guam to Australia.

Although his command had previously delayed Lt C's departure pending the completion of the instant trial, it acceded to Lt C's request, apparently as an accommodation to his personal and financial concerns. It was agreed between Lt C and his commanding officer that the outstanding counsel requests would be "nullified," with Lt C returning to Guam as appellant's individual military counsel. This agreement was reached after Lt C had assured his commanding officer that he, Lt C, would "assist in his own return" to Guam. He also stated these arrangements "probably would be satisfactory with [appellant] inasmuch as his concern has been, 'Mr C, I want you to represent me.'" It is unclear whether Lt C's agreement to assist in his return meant his assumption of the cost of that return or whether he would receive from appellant his express agreement to the details of this arrangement.

In fact, Lt C had not discussed these arrangements with his client. Neither did he inform appellant of the agreement he proposed to make to the Government; nor did he attempt to get his client's acquiescence to the arrangement prior to his departure. Instead, he discussed with his client, on Friday, 8 May 1981, the occasion of his

---

6. Article 34, UCMJ.

7. Article 32, UCMJ.

imminent transfer which would result in his leaving the island temporarily. He nevertheless assured appellant that he would return to defend appellant at his own personal expense. There is no indication in the record whether Lt C advised appellant of those other personal reasons which were the motivating factors for Lt C's detachment prior to 1 June 1981. There was no discussion between Lt C and appellant at which the former proposed to his client that he nullify those IMC requests still outstanding.

That discussion on 8 May 1981 was the last meeting between Lt C and appellant prior to Lt C's return to Guam for trial on 1 June. On Monday, 11 May 1981, Lt C proposed the agreement discussed above and was detached that same day. He flew to California the following day. Appellant was not a party to these agreements.

On 12 May 1981, the convening authority relieved Lt C as detailed defense counsel and appointed Lt P in his place. A message also was sent to LCdr Friedman's command cancelling appellant's request for him to act as IMC. In the meantime, however, LCdr Friedman had been made available by his command to represent appellant at the trial scheduled for 1 June 1981. Apparently the convening authority had not received this message confirming LCdr Friedman's availability until the day subsequent to Lt C departure.

Upon his appointment, Lt P discussed these developments with the appellant. Both then, and later at trial, McKinley indicated he expected Lt C to continue as his detailed defense counsel and LCdr Friedman to serve as his IMC. Lieutenant P

made these expectations known to the convening authority by a letter dated 14 May 1981, pointing out the extensive attorney-client relationship already existing between appellant and Lt C. He expressed the opinion that no good cause existed which would permit the convening authority to sever that relationship. He also stated his client's request that LCdr Friedman still be brought to Guam for the trial scheduled to commence 1 June 1981. The convening authority denied these requests, relying upon the representations of Lt C previously made without appellant's consent or knowledge.

Present at the first Article 39(a) session on 2 June 1981 were Lt C and Lt P. Lieutenant Commander Friedman was not present. At the first opportunity, contrary to all previous negotiations, Lt C stated his belief that he remained appellant's detailed defense counsel despite having been relieved. He, of course, had little choice in the face of his client's expressed desires. Lieutenant C then sought a continuance until LCdr Friedman could be present for appellant's trial.

■ With these facts, the military judge found the relief of Lt C as appointed counsel was made without good cause. The trial was continued until 7 July 1981 to permit appellant to resubmit his request for LCdr Friedman's representation.[8] It was subsequently determined, however, that LCdr Friedman was not available to represent appellant on 7 July 1981, or any other date in July. Trial proceeded on 7 July 1981 with appellant represented by Lt C and Lt P.[9]

---

8. In case of LCdr Friedman's unavailability, appellant renewed his request for IMC representation, in the alternative, by any one of six judge advocates previously requested in the list of 22. The availability of each was denied by his respective command. This case is a prime example of the need for, and wisdom of, the legislative and regulatory changes pertaining to representation by IMC which resulted from the passage of the Military Justice Amendment of 1981, Pub.L. 97–81, 95 Stat. 1085. *See* Article 38(b), UCMJ, 10 U.S.C. § 838(b), as it is presently constituted; paragraph 46*d, Manual for Courts-Martial, 1969 (Rev.);* JAGMAN, § 0110A.

9. The determination of LCdr Friedman's unavailability to serve as appellant's IMC was appealed without avail to the Commander, Naval Legal Service Command. At trial, the military judge refused to rule on a defense motion to review that decision *de novo.* The defense claimed an improper standard of review had been applied. *See United States v. Redding,* 8 M.J. 719 (N.C.M.R.1979). It is proper and expected that military judges rule on motions such as this. *Cf. United States v. Covington,* 12 M.J. 932 (N.M.C.M.R.1982). The practical effect of his refusal to rule permitted the determination of unavailability to stand. Our independent review of LCdr Friedman's unavailabil-

■ As a result of the remarkable events described above, we are left to determine: (1) whether Lt C erred when he entered into the agreement to cancel the outstanding IMC requests and to substitute himself as IMC without appellant's knowledge or consent; (2) whether or not error was committed by those persons acting on behalf of the Government as a party to this agreement; and, (3) if either of the former questions is answered in the affirmative, did this error result in the denial of effective assistance of counsel to appellant *at any stage* of his trial. Although we now answer each of the first two questions affirmatively, finding both the actions of the several parties concerned contrary to sound legal practice, we do not find that appellant suffered material prejudice requiring corrective action. Appellant was not deprived of the effective assistance of counsel.

There can be no doubt but that Lt C acted contrary to the interests of his client when he acted to abrogate his client's outstanding IMC requests, thereby placing his own personal interests paramount to those of appellant. A defense attorney carries the heavy responsibility of furthering his client's interests to the full extent that the law and standards of professional conduct permit.

> Once a case has been undertaken, a lawyer is obliged not to omit any essential honorable step in the defense, without regard to compensation or the nature of the appointment.

ity brings us to this same conclusion. *United States v. Quinones,* 1 M.J. 64 (C.M.A.1975).

**10.** Standard 4–1.1(b) requires a defense attorney "to serve as the accused's counselor and advocate with courage, devotion, and to the utmost of his or her learning and ability and according to law."

**11.** ABA Standard 4–3.5(a): At the earliest feasible opportunity defense counsel should disclose to the defendant any interest in or connection with the case or any other matter that might be relevant to the defendant's selection of a lawyer to represent him or her.

**12.** ABA Standard 4–1.6: The duties to a client are to represent the client's legitimate interests, and considerations of personal and professional

*Commentary,* Standard 4–1.1, The Defense Function, ABA Standards for Criminal Justice (1980), (hereafter cited as ABA Standards).[10]

By allowing his personal interests to influence his actions with regard to the conduct of his client's defense, Lt C did not bear well those heavy responsibilities demanded of the defense attorney. ABA Standard 4–3.5(a);[11] ABA Standard 4–1.6.[12] By his agreement to "nullify" his client's IMC request without consulting appellant, he acted upon a matter wholly within the right of appellant to decide. *See* ABA Standard 4–3.1(b).[13] He further compounded these breaches of professional responsibility when he failed to inform his client of the agreement or its consequences. ABA Standard 4–3.8.[14]

To the extent that Lt C behaved in an irregular fashion because of personal pressures prior to trial, the role of the Government in the proposal to nullify the IMC requests and to substitute in their place one for Lt C cannot be overlooked. We do not find nor does appellate defense counsel now claim, however, any evidence of bad faith in the conduct of those Government parties who relied upon the initial representations of Lt C that the arrangement "probably would be satisfactory" with his client. Hindsight, of course, would dictate that Lt C's commanding officer should not have relied upon the representations of Lt C. He should have received from appellant his express agreement to the proposed arrangement before Lt C's detachment. Yet, to im-

advantage should not influence the lawyer's advice or performance.

**13.** ABA Standard 4–3.1(b): The conduct of the defense of a criminal case requires professional skill and judgment. Therefore, the technical and professional decisions must rest with the lawyer without impinging on the right of the accused to make the ultimate decisions on certain specified matters....

**14.** ABA Standard 4–3.8: The lawyer has a duty to keep the client informed of the developments in the case and the progress of preparing the defense.

pose upon our system of criminal justice a requirement to receive from an accused his or her express agreement to every representation of defense counsel is an unnecessarily onerous and impractical burden, if not an invasion of the attorney-client relationship itself. Such is not justified, even by the circumstances of this case.

The more serious delict on the part of Government representatives occurred when, upon receiving notice of the absence of appellant's knowledge of or agreement to Lt C's proposal, the convening authority steadfastly held to the terms of that agreement. The practical effect of this was to delay appellant's trial pending compliance with the appropriate directions of the military judge that LCdr Friedman's availability be redetermined in accordance with appellant's request for IMC representation.

There certainly was not a fatal severance of an attorney-client relationship between appellant and LCdr Friedman when the convening authority declined on 16 May 1981 to bring LCdr Friedman to Guam as appellant's IMC for trial scheduled on 1 June 1981, despite LCdr Friedman's availability for that date. No such relationship existed. *Cf. United States v. Otterbeck,* 50 C.M.R. 7 (N.C.M.R.1974). Nor was there severance of the relationship which existed between appellant and Lt C merely by Lt C's detachment and transfer. *United States v. Murray,* 20 U.S.C.M.A. 61, 42 C.M.R. 253 (1970); *United States v. Otterbeck, supra. See also United States v. Eason,* 21 U.S.C. M.A. 335, 45 C.M.R. 109 (1972); *United States v. Owensby,* 46 C.M.R. 523 (N.C.M.R. 1972).

By this, we certainly do not mean to imply either there was intended to be or there was a real potential for a severance of the relation enjoyed by the appellant and Lt C. There is nothing in the record that remotely could be interpreted as such. Inasmuch as the convening authority, Commander U.S. Naval Forces Marianas/Commander U.S. Naval Base Guam is the area coordinator for the Commanding Officer, U.S. Naval Communication Station, Harold E. Holt, the potential for such a severance was speculative, at best.

Recognizing the potential for fatal error if appellant's request for IMC representation by LCdr Friedman had not been permitted to go forward unhindered by Government opposition, the military judge properly continued the case so that appellant could be afforded his rights to individual military counsel of choice. No more than a reasonable continuance was required. *United States v. Roberts,* 14 M.J. 584 (N.M.C.M.R.1982). Therefore, that error was cured by the actions of the military judge in permitting appellant to resubmit his request for IMC.

Notwithstanding LCdr Friedman's having been made available for trial in June, there was no error when he was determined to be unavailable for trial in July. The changed circumstances necessitating his presence at his own command during the latter month were of sufficient moment to justify that determination. As no attorney-client relationship had been established during the interim period, the standard of availability to be applied upon consideration of the second request was the same as that applicable to the initial request. *United States v. Olmstead,* No. 81 3007 (N.M.C. M.R. 18 October 1982). *See also United States v. Ettleson,* 13 M.J. 348, 351–355 (C.M.A.1982).

Although the revocation of appellant's request for representation by LCdr Friedman was error, we have concluded that this error was subsequently cured. Any prejudice to appellant is speculative at best. Indeed, our reading of the record has disclosed no prejudice. Notwithstanding the actions of Lt C already described herein, the representation provided by Lt C and Lt P reflects an intelligently prepared, well-contested defense. The errors of the former in no way amount, under the circumstances of this case, to inadequate or ineffective assistance of counsel. Appellant was not denied a constitutional or statutory right of assistance of reasonably competent counsel. *See United States v. Rivas,* 3 M.J. 282, 287 (C.M.A.1977). Appellant has not demonstrated that the outcome of his trial would

have been any different. *See United States v. Batts,* No 74 2467 (N.C.M.R. 28 June 1976). This assignment of error is without merit.

Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

Senior Judge GLADIS and Judge GARVIN concur.