UNITED STATES

v.

**Master Sergeant Paul R. MILLER,
FR001–38–6743, United States
Air Force.**

**ACM 31206.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 26 Aug. 1993.

Decided 7 May 1996.

Appellate Counsel for Appellant: Mr. William J. Holmes (argued), Colonel Jay L. Cohen, and Captain Mark J. Simms.

Appellate Counsel for the United States: Major E. David Hoard (argued), Colonel Jeffery T. Infelise, and Colonel Thomas E. Schlegel.

Before DIXON, SCHREIER, and STARR, Appellate Military Judges.

## OPINION OF THE COURT

SCHREIER, Senior Judge:

Among other issues, this case requires us to address the drafting of Article 134 specifications not listed in the MANUAL FOR COURTS-MARTIAL, UNITED STATES (MCM), Part IV, paragraph 60 (1984). Contrary to his pleas, members convicted appellant of four incidents of pandering by wrongfully enticing a female to engage in a sexual act for hire, three specifications of obstruction of justice, and one specification each of showing pornography to minors, supplying alcohol to minors, assault, and an attempted indecent act with a minor. Articles 134, 128, 92, and 80,

UCMJ, 10 U.S.C. §§ 934, 928, 892, and 880 (1988). Members acquitted appellant of raping PYW, and one specification each of pandering, obstructing justice, and committing an indecent act with a minor. Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920 and 934.

Appellant was sentenced to a dishonorable discharge, confinement for 10 years, and reduction to E–1. Following receipt of appellant's clemency submissions, the convening authority directed a post-trial Article 39(a) hearing to investigate allegations that: (1) Colonel Reinholt, the president of the court-martial panel, exercised unlawful command influence by sending the other members of the court-martial copies of his response to appellant's request for clemency recommendations; and (2) the members improperly considered the security measures and alleged threats against trial participants during deliberations. The military judge found that the members did not receive a copy of the court president's response to appellant's clemency request. He further found that the security measures had no effect on the members' deliberations. After reviewing these findings, the convening authority took action on the case. He reduced the confinement to 8 years while approving the remainder of the sentence.

Appellant alleges numerous errors claiming violations of his constitutional right to a fair trial. Specifically, he alleges the evidence is factually and legally insufficient to support his convictions, he was denied his right to present a defense, the military judge was biased, and the post-trial Article 39(a) hearing was conducted improperly. We agree with several of appellant's assignments of error and take appropriate action, including reassessing the sentence.

## BACKGROUND

During summer 1992 while appellant's wife and two youngest children were away from home on an extended visit with her family, appellant befriended a number of "street kids" from Omaha in an effort to "help them." Appellant testified that he initially took about 15 teenagers out for pizza, showed them around the base, and then invited them into his home to get them off the streets.

This initial meeting took place in the evening with everyone arriving at appellant's home around 10:00 p.m. Appellant claimed that he went to bed shortly after arriving at his home. When he awakened about 2:00 a.m., there had been a disturbance and he then took the Omaha teenagers home. Over about a three week period, on numerous occasions, some of these teenagers either showed up at his house or he picked them up and brought them to his house. These visits primarily occurred during the evening and extended throughout the night. Appellant described a pattern of putting someone in charge while he went to bed. Appellant asserted that the Omaha "kids" abused his trust and got into his alcohol and pornographic tapes. Appellant denied supplying alcohol to minors or showing them his adult movies.

The Omaha teenagers testified that, after meeting appellant, he invited them to his home. Normally, they would go out for pizza and frequently they would stop at the grocery store to buy beer. Approximately nine witnesses testified about parties at appellant's house during which he allowed them to use his Jacuzzi, supplied them with alcohol, and allowed them to watch both regular and pornographic videotapes. These witnesses testified that appellant would pick them up and drive them to his house. They also indicated that appellant was frequently present during these parties and only went to his room to sleep on occasion. Several of the witnesses indicated appellant personally handed them alcohol or put a pornographic movie in the video. Others indicated that appellant was present and observed them drinking or watching the pornographic movies.

During this same time frame, appellant's 16-year-old son also had friends over at the house for get-togethers. These friends primarily lived in Bellevue near Offutt Air Force Base. Five teenagers testified for the government that they attended parties at appellant's house where they drank alcohol and watched pornographic movies. These witnesses indicated that appellant either handed them alcohol or observed them drinking. However, numerous other teenagers

testified for the defense. They denied the presence of alcohol or pornography at these parties. Although several of his son's friends admitted that alcohol was present at these gatherings, they claimed that appellant neither provided the alcohol nor knew that it was there.

After several weeks of these parties, it appears that appellant kicked the Omaha group out of his house. However, he did maintain contact with a few individuals. It is unclear when the gatherings with his son's friends ended. Although the two groups may have been present in appellant's home at the same time, the two groups did not normally associate together. The common link was appellant and his home. Most of the individuals visiting appellant's house were under age 16.

This investigation and the subsequent charges resulted from an initial complaint of rape by an Omaha girl in July 1992. During the follow-up interviews, several of the girls from both Omaha and Bellevue alleged that appellant asked them to perform various sexual acts for compensation. The Air Force Office of Special Investigations (AFOSI) obtained other statements describing the availability of alcohol and pornographic movies.

In spring 1993, appellant spoke with several members of the Omaha group. He claimed that one of the members of the group, Bubba, contacted him saying he wanted to tell the truth about what happened and wanted to change his prior AFOSI statement. Appellant videotaped several individuals repudiating their original AFOSI statements. Also, with appellant's assistance, a number of these same individuals made notarized statements retracting their AFOSI statements. These witnesses denied contacting appellant and claimed that appellant approached them offering various items, such as food, cigarettes, money, or a gun collection, to change their statements. These incidents formed the basis for the obstruction of justice charges. Additionally, several other teenagers admitted that they asked appellant for compensation for changing their statement. These contacts were not charged as an offense.

## FINDINGS OF GUILTY

■ Appellant incorporates attacks on numerous specifications under the broad umbrella of sufficiency of the evidence. While several of his complaints involve determinations as to the factual sufficiency of the evidence, others challenge the validity of specifications charging misconduct under Article 134. The standard of review for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). Specifically, appellant's challenge to the sufficiency of the specifications alleging pandering presents a question of first impression.

### Does the Offense of Pandering Require Three Parties?

Appellant was convicted of four specifications of violating Article 134 in that he did "wrongfully compel, entice, or procure [each of four named individuals] to engage in an act[s] of sexual intercourse for hire and reward with the said Master Sergeant Paul R. Miller." Although the specifications do not include the word pandering, all parties at trial considered the specifications as alleging the offense of pandering. However, the term pandering was not used before the members except for two occasions during trial counsel's closing and rebuttal arguments. The military judge did not include the term pandering in her instructions on the offense.

The MCM lists pandering as a specified offense under Article 134. The elements of pandering are:

(a) That the accused compelled, induced, enticed, or procured a certain person to engage in an act of sexual intercourse for hire and reward with a person to be directed to said person by the accused;

(b) That this compelling, inducing, enticing, or procuring was wrongful; and

(c) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline or was of a na-

ture to bring discredit upon the armed forces. MCM, Part IV, paragraph 97b(2). The maximum confinement for pandering is 5 years.

 In a pretrial motion, the defense argued that both a reasonable interpretation of the model specification and case law required the participation of a third party. The defense further asserted that the specification did not allege another Article 134 offense similar to pandering because the government cannot arbitrarily eliminate an element of the offense. The military judge determined that pandering did not require the participation of a third party because the gist of the offense is the solicitation to engage in sex for hire. However, the military judge qualified her decision with the observation that if she was wrong, the specification still alleged a general Article 134 offense of conduct prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.

We could locate no military case where the offense of pandering did not involve a third party. *See United States v. Gallegos,* 41 M.J. 446 (1995) (pandering does not require compensation for sexual acts); *United States v. Snyder,* 1 U.S.C.M.A. 423, 4 C.M.R. 15, 18–19, 1952 WL 2675 (1952) (pandering exists even if no expectation of financial gain). Moreover, the traditional view of the offense is that the basis of the offense is not "the element of payment or consideration, but the arranging or procuring by the accused of a female for illicit sexual intercourse with other persons." *United States v. Barcomb,* 3 C.M.R. 623, 625, 1952 WL 2000 (A.F.B.R.) (citations omitted), *aff'd,* 2 U.S.C.M.A. 92, 6 C.M.R. 92, 1952 WL 2281 (1952). *See United States v. Bohannon,* 20 C.M.R. 870, 879, 1955 WL 3655 (A.F.B.R.1955). The model specification itself does not unambiguously require a third party but it certainly implies the need for a third party. Earlier versions of the MCM do not define the word "pandering" or provide additional guidance.

When military precedents are not clearly on point, one may look to other sources to clarify the meaning of a word. BLACK'S LAW DICTIONARY (5th ed. 1979) defines "pander" as "to pimp; to cater to the gratification of the lust of another." WEBSTER'S defines "pander" as "a go-between or liaison in sexual intrigues." Additionally, the word "pander" itself apparently originated in ancient mythology. Pandarus was the procurer of Cressida for Troilus in a story popularized in a comedy by Shakespeare. WILLIAM SHAKESPEARE, TROILUS AND CRESSIDA.

After considering prior case law, common definitions, and the historical background of the term, we are convinced that the offense of pandering requires a third party. Thus, we agree with appellant's claim that the specification failed to state the offense of pandering.

### If Not Pandering, Then What?

 That does not end our discussion for we must further consider if the specification as drafted and instructed upon states an offense under Article 134. The model specifications under Article 134 do not provide an all inclusive list of the methods of violating Article 134. However, "the Article contemplates only the punishment of that type of misconduct which is directly and palpably—as distinguished from indirectly and remotely—prejudicial to good order and discipline." *United States v. Holiday,* 4 U.S.C.M.A. 454, 456, 16 C.M.R. 28, 30, 1954 WL 2423 (1954). Prosecutors are not free to eliminate essential elements of model specifications and direct the remaining elements be prosecuted as an Article 134 service-disorder or discrediting conduct offense. *United States v. Manos,* 8 U.S.C.M.A. 734, 736, 25 C.M.R. 238, 240, 1958 WL 3130 (1958) (negligent exposure is not an offense under the Code). Generally, there must be some "ancient usage" supporting the prohibited offense. *Id.* 25 C.M.R. at 239. "Some conduct, however, is so clearly and patently disorderly that common sense—rather than 'ancient usage'—is sufficient to afford the necessary notice to a potential accused that such action is not tolerable by an orderly, civilized society." *United States v. Choate,* 32 M.J. 423, 428 (C.M.A.1991) (Everett, J., concurring) ("mooning" as an Article 134 offense). The law further requires that an accused be on notice that his conduct is unlawful. *Parker v. Levy,* 417 U.S. 733, 755, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974).

The test for legal sufficiency of a specification is not whether it could have been improved but whether it states the elements of the offense, whether the defense is aware of what it must defend against, and whether the accused is protected against a subsequent prosecution. *United States v. Sell,* 3 U.S.C.M.A. 202, 206, 11 C.M.R. 202, 206, 1953 WL 2005 (1953). Military appellate courts routinely sustain findings of guilty to an offense necessarily included within the one charged. *See United States v. Weymouth,* 43 M.J. 329 (U.S.Armed Forces 1995); *United States v. Williams,* 17 M.J. 207, 215 (C.M.A.1984) (insufficient evidence of jurisdiction to uphold kidnapping offense alleged as assimilated crime, but conviction sustained under the first two clauses of Article 134); *United States v. Mayo,* 12 M.J. 286, 293 (C.M.A.1982) (specification which failed to properly allege a U.S. Code violation did support a charge of conduct prejudicial to good order and discipline); *Snyder,* 4 C.M.R. at 18–19 (approved conviction on specification alleging pandering without element of hire).

Appellant had ample notice of the elements of the offense and was prepared to defend against those elements. He was charged with asking individuals to engage in sexual intercourse for hire. In fact, trial defense counsel conceded that the government "could have created their own offense under Article 134 . . . but they made a mistake in charging this as pandering." The issue is not whether appellant had notice of the elements, but whether these elements stated an offense and the nature of that offense.

We find that appellant's actions approximate the offense of solicitation of another to commit prostitution. We have no difficulty in finding that under the circumstances of this case asking others to engage in sex for compensation is prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces. *See Gallegos,* 41 M.J. at 448 (Sullivan, C.J., concurring) (specification alleging accused arranged for others to have intercourse with his wife alleges conduct prejudicial to good order and discipline and there is no need to review scope of pandering as a crime).

Contemporary criminal justice routinely punishes both the prostitute and the "john" who approaches the prostitute. The difficulty in this case was not in drafting the specification but in the parties mistakenly using the label of "pandering" to describe the offense. The label was inaccurate, but under the circumstances of this case the label does not control our resolution of the issue. Here, appellant had notice of the elements of the offense and the members were properly instructed on the elements. Any error which resulted from the mistaken use of the label goes to punishment, which we will cure when we reassess the sentence.

We find that the challenged specification states an offense under Article 134, that both common sense and ancient usage provided notice to the appellant that his actions were illegal, that appellant was aware of the elements of the offense so as to develop a defense, and that appellant is protected from future prosecution for this conduct. Furthermore, we are convinced beyond a reasonable doubt that the evidence supports the findings of guilty except with regard to the addition of the phrase concerning sodomy in two of the specifications. Article 66(c), UCMJ.

*Can Appellant be Convicted of Solicitation of Sodomy Under the Same Specifications?*

■ The initial specifications alleged that appellant compelled, enticed, or procured an act or acts of sexual intercourse. During an Article 39(a) session reviewing findings instructions, the military judge indicated her intention to instruct the members they could add the phrase "and sodomy" after the phrase "sexual intercourse" in specifications 4 and 5 of Charge II. The findings worksheet was prepared alleging that appellant compelled, enticed, or procured an act of sexual intercourse and sodomy for hire. Appellant did not object at trial, but now alleges this was error. The members found appellant guilty of the additional words "and sodomy" in specifications 4 and 5 of Charge II.

■ It is accepted practice in military law to find an accused guilty of an offense by exceptions and substitutions to conform to the evidence. R.C.M. 918(a)(1). However, we believe the actions of the military judge

went beyond substitution and amounted to additions which changed the nature of the offense and increased the severity of the offense or the maximum punishment for it. R.C.M. 918(a)(1). Additionally, we believe that the appellant was not provided proper notice that his alleged offense included solicitation of sodomy. In our decretal paragraph, we will disapprove the additional words "and sodomy" in specifications 4 and 5 of Charge II and reassess the sentence.

### Showing Pornographic Movies to Minors

■ Appellant makes a three-pronged attack on his conviction for showing pornographic movies to certain named minors. He alleges the specification, as drafted, fails to state an offense, the evidence does not prove the movies the teenagers watched were pornographic, and the instructions improperly indicated he could be convicted of the offense even if he did not put the videotapes on to play. We find appellant's second argument persuasive.

The teenagers discussed watching numerous movies at appellant's home, only some of which they labeled pornographic. Several of the teenagers, including members of both the Omaha and Bellevue groups, described the movies as showing naked men and women having sex. The military judge did not allow trial counsel to explore the nature of the films in more detail. The labeling of tapes as pornographic and the description of naked men and women having sex is not enough in itself to find that the tapes are pornographic. *See United States v. Marrie,* 39 M.J. 993, 1003–1004 (A.F.C.M.R.1994). While the AFOSI also described some of these tapes as pornographic and appellant admitted that he had pornographic tapes, it is unclear that the parties were talking about the same tapes. We are not persuaded beyond a reasonable doubt that the movies the teenagers watched were pornographic. We will dismiss that specification and reassess the sentence.

### Providing Alcohol to Minors

■ Appellant further alleges that the findings of guilty on the specification alleging he provided alcohol to minors cannot stand. He claims that the military judge again im-

properly instructed the members that appellant could be found guilty of the offense if minors obtained alcoholic beverages while in his house. We disagree with appellant's statement of the instructions. The military judge instructed the members they could find the appellant guilty of the offense if he "knowingly gave or made available or knowingly permitted another to give or make available alcoholic beverages in his possession or under his control." Contrary to appellant's assertion, the instructions required either a specific act accompanied by a criminal intent or actual *mens rea.* We find no error.

### Obstruction of Justice

■ Appellant was convicted of three specifications of obstructing justice. He now alleges that the evidence is factually insufficient to support these findings of guilty. He testified that the teenagers contacted him offering to make things right. We find appellant's argument that Bubba contacted him almost eight months after the initial statements to set things right incredible. We are convinced that appellant initiated these contacts. While a few individuals may have hoped to benefit from appellant's largess and requested payment to change their statements, we do not believe that applied to the individuals named in the specifications. Like the members, we are persuaded of appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ.

### DENIAL OF RIGHT TO DEFEND ONESELF

■ Under this assignment of error, appellant addresses challenges to the military judge's decisions to deny a witness request and to limit cross-examination of certain government witnesses. He also alleges he was denied his right to military counsel during the pretrial investigative stages of this case and the formal Article 32, UCMJ, investigation. We review complaints about the production of witnesses or admissibility of evidence under an abuse of discretion standard. *United States v. Leiker,* 37 M.J. 418 (C.M.A.1993); *United States v. Tangpuz,* 5 M.J. 426, 429 (C.M.A.1978). Constitutional

due process issues are subject to a *de novo* review. *United States v. Collier,* 36 M.J. 501 (A.F.C.M.R.1992), *pet. denied,* 38 M.J. 461 (C.M.A.1993).

### Denial of Witness Request

 About one month before trial, defense requested the presence of Dr. Leigh, appellant's former doctor, as a trial witness for several purposes: to testify that appellant demonstrated good military character, truthfulness, peacefulness, and appropriate behavior toward women; to describe appellant's medical conditions that made it difficult and painful for him to have an erection; and to describe the effect of appellant's medications which caused him to sleep and relax. After contact with Dr. Leigh, the government denied the request because Dr. Leigh was unable to testify about the character information and Dr. Leigh indicated that any physician could review the side effects of appellant's medications. Dr. Leigh further told trial counsel that he had not spoken to defense counsel.

However, the government produced another defense-requested treating physician, Dr. Skeel, appellant's urologist. Dr. Skeel testified about appellant's medical problems in detail, including information on appellant's scrotal pain. He suggested that a pharmacist would be in the best position to discuss the side-effects of appellant's various medications. At this point, the defense renewed their request for Dr. Leigh. The military judge denied the request as cumulative, indicating that defense could call a pharmacist to discuss the effect of the medications.

 Defense now alleges that the failure to produce Dr. Leigh was error. We disagree. The defense never explained how Dr. Leigh's testimony was not cumulative with the testimony of Dr. Skeel and Lt Col Gurfitz, the pharmacist. Finally, we cannot help but note that at the time defense initially litigated the government's failure to produce Dr. Leigh, they had not interviewed him but were basing his expected testimony on the medical records. At no time throughout the trial did defense ever make a proffer of specific testimony based on actual contact with Dr. Leigh. *See United States v. Vietor,* 10 M.J. 69, 72 (C.M.A.1980) (defense counsel was remiss in not communicating before trial with requested witness). Moreover, the government's contact with Dr. Leigh indicated that Dr. Leigh did not have any specific information to benefit appellant's case. While we acknowledge that the accused has an equal opportunity to call witnesses on his behalf, we do not believe that right extends to cumulative witnesses. Article 46, UCMJ; *United States v. Williams,* 3 M.J. 239, 243 (C.M.A.1977). Based on the totality of the circumstances, we find that the military judge did not abuse her discretion in denying the defense request to produce Dr. Leigh.

### Denial of Right to Cross–Examine Government Witnesses

 Defense counsel sought to question the government witnesses who attended the parties at appellant's house concerning their juvenile (criminal) and mental health records. Defense claimed that this questioning was necessary to impeach their ability to perceive the events, to challenge their credibility, and to show their bias and motivation to lie. The military judge carefully reviewed the records of each individual including the nature of the juvenile offenses and the witnesses' current status in the juvenile system. She also reviewed the mental health records. With few exceptions, the military judge prohibited cross-examination on the juvenile and mental health records. However, she did allow questions concerning the witnesses' ability to perceive the events. Defense now alleges this was error.

We find that the military judge did not abuse her discretion in refusing to permit questioning on the juvenile records. Despite the defense contention that this questioning would establish motive to lie and bias, they never explained how this information would do so. The fact that someone has had prior disciplinary problems is not alone enough to establish motive or bias in an unrelated case. Unlike the *Davis* case cited by appellant, these witnesses were not potential suspects for the questioned offenses and were not on probation for a similar crime. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). If anything, these witnesses

were subjecting themselves to future criminal actions based on their admissions of underage drinking. Moreover, the juvenile records do not reflect evidence of untruthfulness or conviction of an offense which would be admissible to impeach an adult. *See* Mil. R. Evid. 609(a) and (d).

We further reject appellant's argument that cross-examination on their juvenile records would have revealed that the government witnesses were lying because of an anticipated future benefit. The defense never proposed a specific benefit the witnesses would receive for supporting the government's case. Rather, they appeared to be engaged in a fishing expedition. There was no evidence that any of the witnesses were promised a "Get Out of Jail Free" card if they testified against appellant. Appellant's contention that the payment of witness fees provided a benefit to the witnesses which would prompt their false statements is incredible. *United States v. Bins*, 43 M.J. 79, 85 (1995) (payment of witness fees does not prove bias or motive to misrepresent because both government and defense witnesses receive standard mileage and witness fees). Additionally, the military judge instructed the members that all witnesses are paid standard witness fees.

Finally, the military judge limited the questioning on the mental health records to those areas where the testimony of the witnesses contradicted information in the mental health records. She also clarified the nature of the mental health treatment. The defense also argues that she improperly "sealed" these records. We have carefully reviewed these records and find no error in the limitations on cross-examination or sealing the records.

### Denial of Right to Counsel

Appellant alleges he was denied his right to military counsel of choice during the pretrial processing and Article 32 investigation. He points to the fact that numerous requests for individual military counsel were denied, several appointed military defense counsel became unavailable before trial, and that he was not represented by military counsel at the Article 32 investigation. We will discuss only the latter two areas.

Appellant's initial detailed counsel was Captain Strafuss. He represented appellant from July 1992 at least through November 1992. During this same time frame, Captain Paul was detailed to the case and remained on it until May or June 1993. After Capt Paul, Captain Stenton was detailed as counsel. However, in late July 1993, several weeks before trial, she "withdrew" from the case. It is unclear if she had formed an attorney-client relationship with appellant. Captain Rivera was then detailed as counsel and served as counsel throughout the court-martial. Additionally, appellant was represented by civilian counsel, Mr. Cohen, from December 1992 throughout the trial.

Mr. Cohen was appellant's sole counsel at the Article 32 investigation. The Article 32 investigating officer's report states that "Mr. Cohen stated to me on behalf on the accused he specifically waived military counsel for purposes of the Article 32 hearing...."

During an Article 39(a) session, the military judge noted that the record of trial did not contain paperwork documenting appellant's release of his various military defense counsel. She reviewed the sequence of events and the basis for the release of military defense counsel with appellant and the defense team. Mr. Cohen, appellant's civilian and lead counsel, replied that the defense agreed that appellant had released Captains Strafuss, Paul, and Stenton. The military judge asked appellant if he agreed to release Captains Strafuss and Paul and he replied that he had. For some unknown reason—probably oversight—the military judge neglected to confirm with the appellant Mr. Cohen's statement that appellant had released Captain Stenton. Although the military judge failed to confirm Captain Stenton's release with appellant, the appellant did not disagree with Mr. Cohen's statement either when it was made or during his posttrial clemency submissions. Additionally, during the initial Article 39(a) session, appellant never indicated that he wanted to be represented by other military counsel. Rather, he asserted his desire to be represented by Captain Rivera and Mr. Cohen.

 A military member has the right to be represented at a trial by court-martial by either a detailed military counsel or a military counsel selected by the member, if reasonably available. Articles 27 and 38(b), UCMJ; R.C.M. 506(a). The government may not sever an existing attorney-client relationship without good cause. *United States v. Plott,* 38 M.J. 735, 737 (A.F.C.M.R.1993). Administrative, financial, or logistical inconvenience does not constitute good cause. *United States v. Eason,* 21 U.S.C.M.A. 335, 339, 45 C.M.R. 109, 113, 1972 WL 14135 (1972). Only the accused may terminate the attorney-client relationship prior to the case reaching the appellate level. *United States v. Iverson,* 5 M.J. 440, 443–44 (C.M.A.1978). A military attorney may not unilaterally withdraw from a case. *United States v. Acton,* 38 M.J. 330, 337 (C.M.A.1993). *But see United States v. Hardy,* 44 M.J. 507 (A.F.Ct. Crim.App.1996). In most situations, any release of counsel must be based on the express consent of the accused. *See Acton,* 38 M.J. at 337.

 While the record of trial does not contain the documents releasing detailed counsel, this issue was discussed on the record. Appellant acknowledged releasing two of his detailed counsel, and Mr. Cohen acknowledged that the appellant had released the third detailed counsel. Moreover, the report of the Article 32 investigation states that appellant agreed to proceed without military counsel.

We do not read *Acton* so narrowly as to prevent us from looking at the record as a whole to decide this issue. Appellant's failure to raise this issue in a pretrial motion adds further support for our finding that appellant released his various detailed defense counsel and did not object to the lack of military counsel representation during the Article 32 investigation. This is especially significant when appellant made a motion concerning the Article 32 investigation as well as numerous other motions. It is unbelievable that appellant or his counsel would not have raised an appropriate motion if they believed that appellant's rights to counsel were violated.

## IMPACT OF EXTRANEOUS INFORMATION

Appellant alleges that his right to a fair trial was violated because the members were subject to prejudicial security measures, were betting on the outcome of the case, and were subject to unlawful command influence by the president of the court concerning submission of clemency letters. We review allegations of due process violations under a *de novo* standard. *Collier, supra.*

### Enhanced Security Procedures

Numerous security procedures were in place during this trial. They included using a metal detector to screen anybody entering the courtroom, stationing AFOSI agents in the spectator section of the courtroom, and using a military working dog to patrol the outside premises. The only mention of security procedures occurred during an Article 39(a), UCMJ, session, when the defense expressed a fear that the AFOSI agents may intimidate the witnesses. The military judge responded that they were there for security reasons. However, the reason for the security procedures was never placed on the record to aid our appellate review of this issue.

 Defense counsel made no further objection to the procedures, nor did they request any limiting instructions. However, during post-trial submissions defense argued that these procedures adversely impacted the members' deliberations and prejudiced them against the appellant. The defense further submitted an affidavit from Chaplain Boone who described his post-trial conversation with the president of the court about the security procedures. According to Chaplain Boone, Colonel Reinholt stated that the members were aware of the threats and the increased security measures.

The convening authority directed that a post-trial Article 39(a) session be convened to consider this issue. A different military judge, Lt Col Held, conducted the post-trial Article 39(a) session, examined the court members, and made findings of fact. All members testified that they were aware of the security procedures. While some thought the procedures were normal, others

believed either they were due to generalized threats against trial participants or specific threats against the appellant. One member indicated he spoke to an unidentified individual who indicated the precautions were due to threats from gangs. Efforts to identify this individual failed. All members testified that the security procedures had no impact on their deliberations. We reject appellant's argument.

We further reject appellant's argument that the military judge erred in not explaining the basis for these procedures to the members. While we are naturally curious about the reason for the security procedures, we are aware of no requirement that the military judge advise the members of the reason for enhanced security procedures and are loath to create such a requirement. Courtroom security is primarily an administrative matter and, as such, creates no legal rights for an accused.

However, we cannot finish our discussion of this matter without expressing some concern that while the military judge was aware of the reasons for the enhanced security, it appears that the defense counsel was not so advised. As a matter of common courtesy, we encourage that counsel for an accused be advised of the nature of and reason for enhanced security procedures to determine if they desire to request limiting instructions for the members. This matter could be handled in an R.C.M. 802 session and the military judge could summarize the basis for the procedures on the record. Based on the circumstances of this case where defense counsel never requested the basis for the enhanced security procedures, the members testified the security precautions had no impact on deliberations, and the precautions appear both reasonable and in line with those present in many federal courtrooms throughout this country, we find no violation of appellant's right to a fair trial.

Finally, we reject appellant's assertion that the enhanced courtroom security was prejudicial to the appellant's case. It is just as likely that the evidence of gangs and threats would undermine the members' confidence in the government's witnesses.

*Ex Parte Contact Between the President of the Court and the Staff Judge Advocate*

■ Appellant alleges that Colonel Reinholt, the president of the panel, discussed the security procedures with the staff judge advocate (SJA) during trial. Appellant bases this assertion on the affidavit of Chaplain Boone and the transcript of the post-trial Article 39(a) hearing. Appellant further claims that the SJA should have been called as a witness during the Article 39(a) hearing to address this issue.

During the post-trial Article 39(a) session, Colonel Reinholt stated that some of the court members asked him why the security procedures were in effect. He replied to them that he "had inquired and that [he] had been informed that there had been potential threats on the individual being charged and this was being done for his protection." He did not indicate whom he spoke to concerning these security procedures. He further stated that he was not aware of threats against other trial participants, allegedly the military judge and the prosecutor, until after trial when he discussed the matter with the SJA.

Chaplain Boone's affidavit states that Colonel Reinholt told him that the members knew of alleged threats. Chaplain Boone further stated Colonel Reinholt "did not state how the jury learned this information or from whom it came nor when they learned it, nor did I ask."

■ Contact during trial between a court member and a third party concerning a matter pending before the court is presumptively prejudicial. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *United States v. Hamilton,* 41 M.J. 22, 26 (C.M.A.1994). This presumption must be rebutted by a clear and positive showing that the improper contact could not and did not influence the decision. *United States v. Elmore,* 33 M.J. 387, 393–94 (C.M.A.1991), *cert. denied,* 504 U.S. 909, 112 S.Ct. 1938, 118 L.Ed.2d 544 (1992); *United States v. Adamiak,* 4 U.S.C.M.A. 412, 418, 15 C.M.R. 412, 418, 1954 WL 2310 (1954). We evaluate the entire record to determine if this contact deprived the defendant of a fair trial. *Hamilton,* 41 M.J. at 27. The mem-

ber's assertion that the improper contact had no influence is not conclusive. *Adamiak,* 15 C.M.R. at 419. We must consider the nature of the contact, any curative action, and the weight of the evidence against the accused. *Hamilton,* 41 M.J. at 27.

Even though improper, the contact during trial between the member and the third party concerned only the administrative matter of courtroom security. There was no effort to influence the court-martial as to either findings or sentence. Nor did this contact amount to unlawful command influence. *See United States v. Kitts,* 23 M.J. 105, 108 (C.M.A.1986). Additionally, the thorough questioning of the members in the post-trial Article 39(a) hearing revealed that they were not influenced by the enhanced courtroom security.

Moreover, we are convinced that the enhanced courtroom security had no impact on the decision. This case was essentially a credibility contest. The members had to decide whether they believed the government's or the defense's witnesses. Various witnesses from both the Omaha and Bellevue groups corroborated the parties at appellant's house, the type of alcohol available, and the viewing of movies. Moreover, the record of trial reflects a conscientious panel who remained attentive throughout a long trial, asked numerous questions, and carefully evaluated all the evidence during lengthy deliberations returning with mixed findings of guilt and acquittal.

There was no curative action in this case since the improper contact was not known during trial. However, we find that factor is not controlling under the total circumstances of this case.

■ Next, we must consider whether the military judge erred in refusing to call the SJA as a witness in the post-trial Article 39(a) hearing. We note that the defense never requested the SJA as a witness. Therefore, there is no error. Furthermore, the only clear contact with the SJA was after trial. Even if we were to assume that Colonel Reinholt spoke to the SJA concerning security measures during trial, we are convinced that under the limited circumstances of this case where the members were thor-

oughly questioned concerning any outside influences, the presumption of prejudice associated with the improper contact was overcome by a clear and positive showing that the improper communication did not in any way influence the fairness of the proceedings.

## Unlawful Command Influence

■ After trial was adjourned, defense counsel sent letters to the court members requesting that they submit clemency letters on appellant's behalf. The defense received Colonel Reinholt's letter rejecting clemency, another letter, and no response from eight members of the court. Colonel Reinholt's response indicated that copies of his letter had been sent to the other members of the court. Appellant alleges that Colonel Reinholt's sending of his response to others amounted to unlawful command influence because he was trying to influence the clemency recommendation of others. Appellant further claims that Colonel Reinholt talked to several members of the court about this request and attempted to influence their response.

During the post-trial hearing, Colonel Reinholt stated that copies of his letter were never sent to the other members of the court despite the indication on his response to the contrary. He further indicated that he had only discussed the clemency request with one other member and the two compared their reaction to the request. Both indicated that their minds were made up before the contact. The members responded that they did not receive copies of Colonel Reinholt's letter and any discussions they had with him had no impact on their decision to recommend clemency. The members convincingly stated that there was no attempt to influence their clemency recommendations.

We find that a copy of Colonel Reinholt's letter was never sent to the other members. Moreover, the discussions between Colonel Reinholt and other members of the court did not amount to unlawful command influence.

## Betting on the Outcome of the Case

■ During trial, Mr. Berscheid told the defense he and his daughter overheard a

conversation between two court members wherein one member told the other "I've got your bet covered." Mr. Berscheid interpreted this comment to mean that the members were betting on the outcome of the case. He could not identify the two individuals but stated that they were among the last members going into the jury box. This issue was brought to the military judge's attention and she individually *voir dired* the suspected members. The members denied making or hearing any comments which would indicate someone was betting on the outcome of this case or any other event. While not making any specific findings, the military judge allowed trial to continue. This action surely indicates that the military judge believed the members. We also find their responses credible and reject the allegation of the individual who overheard the alleged conversation between the court members. There was no reason for the post-trial Article 39(a) session to examine this issue due to the military judge's timely and thorough review of the issue when it arose.

## BIAS OF THE MILITARY JUDGE

■ Appellant's attack on the military judge is completely unwarranted. The record of trial portrays a strong military judge who was attempting to maintain control of a long, difficult trial involving over 50 witnesses, numerous motions, and frequent recesses for purposes of trial preparation. During this lengthy 8 day trial, the military judge frequently encouraged counsel to keep things moving, questioned the need for delay, and questioned the accused concerning the reasons he delayed seeking medical attention.

We have carefully reviewed the military judge's actions and find that the comments alleged to be biased were taken out of context and were not made in front of the members. Additionally, the fact that the military judge was an active participant in the trial frequently questioning witnesses and *sua sponte* limiting the questions or argument of counsel does not establish bias. The military judge did not abandon her impartial role and become an advocate for the government. *Compare United States v. Shackelford,* 2

M.J. 17, 19 (C.M.A.1976) and *United States v. Chavez,* 27 M.J. 870 (A.F.C.M.R.1989). There was no error.

## POST-TRIAL ARTICLE 39(a) HEARING

■ Appellant claims that the post-trial Article 39(a) hearing was improperly conducted in that he was denied his right to counsel, he was not permitted to present evidence on his behalf, and the military judge was biased.

On February 23rd, the convening authority directed a post-trial hearing to determine whether the members were subject to extraneous matters and whether the president of the court had attempted to influence the other members by sending them copies of his response to appellant's request for clemency recommendations. On March 1st, the Chief Circuit Military Judge detailed Lt Col Curtin to conduct the hearing. The letter indicated that an April hearing date was anticipated. On March 2nd, the Chief Circuit Military Judge relieved Lt Col Curtin and directed that Lt Col Held conduct the hearing. This letter established a hearing date of March 4th. Appellant arrived on base the night before the hearing. The government obtained the presence of the 10 members of appellant's court-martial, including one who had since moved out of the area and another who had retired.

Captain Rivera, appellant's military defense counsel at trial, had separated from the service, so Captain Stenton was detailed to represent appellant. Captain Stenton indicated she had known that a post-trial hearing would be scheduled for about a week. She stated that when she arrived on base she heard that the hearing would be scheduled that same week, then she heard it would be April, then it was confirmed for Friday. Captain Stenton had previously been detailed to represent appellant at his original trial, but was released before trial.

At this hearing, appellant indicated that he wanted to be represented by Captain Stenton and by Mr. Holmes, his civilian appellate defense counsel. Appellant had earlier retained Mr. Holmes for appellate purposes. However, he retained him for purposes of this hearing on March 3rd, knowing the hearing was scheduled to convene the next morn-

ing. Mr. Holmes requested a continuance without specifying when he would be available. The military judge denied the request for the continuance citing the fact that Mr. Holmes had accepted the case, knowing he could not be present at a scheduled hearing, assuming the court would grant the continuance.

At this hearing, appellant argued that Captain Stenton was not able to adequately defend him because she had not read the record of trial or the clemency submissions. Captain Stenton expressed reservations because she had not reviewed the clemency package. However, even after civilian counsel's request for a continuance was denied, she did not make an independent request for delay.

The military judge concluded that due to the limited nature of the hearing, extensive preparation was not required. The issues were not raised during the court martial and solely resulted from appellant's clemency submissions. The military judge conducted individual *voir dire* of each court member. Throughout the hearing, Captain Stenton was an active participant, asking numerous questions. Appellant has not alleged that Captain Stenton did not represent him in a professional manner or that the absence of his civilian counsel resulted in prejudice to his case.

 Absent clear abuse, a military judge's decision to deny a continuance should not be overturned. *United States v. Browers*, 20 M.J. 356 (C.M.A.1985). The military judge is given wide latitude to ensure that a court-martial is conducted in a fair, orderly, and efficient manner. *United States v. Grant*, 38 M.J. 684, 688–89 (A.F.C.M.R.1993), *aff'd*, 42 M.J. 340 (1995). The right to counsel of choice is not absolute and must be balanced against the efficient and expeditious administration of justice. *United States v. Thomas*, 22 M.J. 57 (C.M.A.1986). Additionally, trial may proceed in the absence of one or more defense counsel if the military judge determines that a delay is not warranted and the accused's right to be adequately represented has not been impaired. R.C.M. 805(c), Discussion.

It is likely that the rapid scheduling of this hearing was in part responsible for appellant's civilian defense counsel's inability to attend the hearing. At a minimum, this rapid scheduling created an appearance of denying appellant adequate opportunity to prepare a presentation. However, we do not find that factor alone controlling under the narrow circumstances of this case.

The restricted nature of this hearing carries significant weight when we review the military judge's decision to deny the continuance. The sole purpose was to determine whether the members had considered extraneous information during either the court martial or the post-trial clemency process. *See* R.C.M. 606(b). The members possessed the necessary information and were the "witnesses" in the hearing. The purpose of this hearing was to develop facts and, indeed, the military judge did not even make conclusions of law. The necessity for advanced preparation was minimal. Nonetheless Captain Stenton was an active participant in this hearing, asking questions and requesting the presence of an additional witness, Chaplain Boone.

We have also carefully considered the presence of parties who had traveled for the hearing, appellant's last minute retention of Mr. Holmes for this hearing, the fact that Mr. Holmes accepted the case knowing he could not attend the hearing, the open-ended nature of the request for continuance, and appellant's representation by detailed military counsel who had at least some prior knowledge of the case based on her earlier appointment and release. We are further persuaded that the scheduling of this case was solely accomplished within judicial and not command channels. There was no unlawful command influence evident in the scheduling of this case. Additionally, the military judge's focus was much more on appellant's last minute actions in retaining an attorney who could not attend this hearing, than on the administrative inconvenience to the government.

Finally, and perhaps most importantly, we look at whether the proceedings were fair. Was appellant's right to be adequately represented impaired? Appellant's military de-

fense counsel was an active participant in these proceedings. Her actions led to the recall of several members and clarified the belief or lack of belief that "gangs" necessitated the security procedures. While her request that Chaplain Boone be called as a witness was denied, appellant's defense counsel clearly advocated appellant's cause through her questions. We have also considered appellant's inability to point to any prejudice to his interests, any additional evidence that could have been offered but was not, or any arguments that could have been made but were not as a result of the military judge's denial of the continuance. This inability to point to problems is reflective of both the limited nature of the proceeding and its fairness in execution.

Under the unique circumstances of this case, we find that the military judge did not abuse his discretion in denying civilian counsel's request for a continuance. However, we want to emphasize that we do not condone this "rush to justice" or believe that it is a commendable example of military justice.

We further find that the military judge did not abuse his discretion when he refused to call Chaplain Boone as a witness because he had Chaplain Boone's sworn affidavit to consider. Additionally, the fact that the military judge ruled contrary to appellant's desire does not mean that the military judge was biased. There was no prejudicial error in the conduct of the post-trial hearing.

## REMAINING ASSIGNMENTS OF ERROR

We have carefully reviewed each of appellant's remaining assignments of error including those personally submitted under *Grostefon* and find no error. *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). We reject appellant's contention that his pretrial restriction interfered with his ability to defend himself. There was no error in the decision to deny him the opportunity to make a verbatim transcript of the Article 32 investigation. R.C.M. 405(j); Air Force Regulation 111–1, *Military Justice Guide*, para. 5–1(e), 30 September 1988. The military judge did not abuse her discretion in refusing to admit the written statements of the wit-

nesses when the witnesses testified about the contents of the statements. *United States v. Button*, 34 M.J. 139 (C.M.A.1992). The military judge did not abuse her discretion in determining the relevance of evidence. Mil. R. Evid. 401. The military judge did not abuse her discretion in failing to give the defense-requested instructions. *United States v. Marrie*, 39 M.J. 993 (A.F.C.M.R. 1994); *United States v. Aker*, 19 M.J. 733 (A.F.C.M.R.1984), *pet. denied*, 20 M.J. 133 (C.M.A.1985).

## SENTENCE REASSESSMENT

We have determined that the appellant was not convicted of the offense of pandering, but of an Article 134 offense that is more closely related to solicitation of prostitution. The maximum imposable punishment for the offense of solicitation of prostitution is a dishonorable discharge, forfeiture of all pay and allowances, and confinement for one year instead of the maximum of five years confinement for pandering as initially considered by the military judge. We will consider the maximum confinement sentence for appellant's offenses of enticing or procuring another to engage in sexual intercourse for hire to be one year confinement each. We have also found that the addition of the phrase "and sodomy" to specification 4 and 5 of Charge II was improper and will delete those phrases in our conclusion and will consider the modified specification in our sentence reassessment. Additionally, we will dismiss the finding of guilty to specification 7 of Charge II alleging that appellant wrongfully showed pornographic movies to minors.

We are confident we can determine what sentence the members would adjudge if they had been properly advised of the nature of the offenses and the maximum possible sentence. *United States v. Peoples*, 29 M.J. 426 (C.M.A.1990). We believe the members would have imposed a sentence of no less than 48 months confinement, reduction to E–1, and a dishonorable discharge. We have considered the extensive mitigation as well as the nature of the offenses, and further find the reassessed sentence appropriate. *United States v. Sales*, 22 M.J. 305 (C.M.A.1986).

## CONCLUSION

We modify the approved findings of guilty for specifications 4 and 5 of Charge II by deleting the phrase "and sodomy." We dismiss specification 7 of Charge II. We approve only so much of the sentence as consists of confinement for 48 months, reduction to E–1, and a dishonorable discharge.

The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and are

AFFIRMED.

Chief Judge DIXON and Judge STARR concur.